CASE NO. 22-4187(L), 22-4192

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

JOSE CRUZ COLON,

*Defendant - Appellant,*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NEWPORT NEWS

———————————

**OPENING BRIEF OF APPELLANTS**

———————————

Sicilia C. Englert
LAW OFFICE OF
SICILIA C. ENGLERT, LLC
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
703-636-2261
sicilia.englert@englertlawoffice.com

*Counsel for Appellant*
  *Jose Cruz Colon*

Fernando Groene
FERNANDO GROENE, PC
364 McLaws Circle, Suite 1A
Williamsburg, VA 23185
757-603-6173
fgroene@groenelaw.com

*Counsel for Appellant*
 *Nastassja Lopez-Alvarado*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................ iii

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION .................................................1

STATEMENT OF THE ISSUES.......................................................1

STATEMENT OF THE CASE...........................................................2

    A.    Procedural History.............................................................2

    B.    Statement of the Facts .......................................................4

SUMMARY OF THE ARGUMENT .................................................15

ARGUMENT ...................................................................................16

    I.    Striking Unvaccinated Jurors Deprived the Defendants of Their
Constitutional Right to a Jury Chosen from a Fair Cross-Section of
the Community ...................................................................16

        A.    Standard of Review .......................................................16

        B.    The Sixth Amendment's Fair Cross-Section Requirement...........16

        C.    The District Court's Elimination of all Unvaccinated Jurors
Violated the Fair Cross-Section Requirement of the Sixth
Amendment ..................................................................19

    II.    There was Insufficient Evidence To Convict Lopez-Alvarado for
of Conspiracy to Distribute More than Five Kilograms of Cocaine
And The District Court Erred In Denying Lopez-Alvarado's
Motion for Acquittal.............................................................29

        A.    Standard of Review .......................................................29

        B.    Discussion ....................................................................29

CONCLUSION ........................................................................................33

CERTIFICATE OF COMPLIANCE ......................................................34

CERTIFICATE OF SERVICE ...............................................................35

# TABLE OF AUTHORITIES

## Cases

*Barber v. Ponte*,
  772 F.2d 982 (1st Cir. 1985), *cert. denied,* 475 U.S. 1050 (1986) .................. 28

*Batson v. Kentucky*,
  476 U.S. 79 (1986) ........................................................................... 6

*Duren v. Missouri*,
  439 U.S. 357 (1979) ...................................................... 18, 19, 23, 25

*Lockhart v. McCree*,
  476 U.S. 162 (1986) .......................................................... 21, 22

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ...................................................... 26

*Smith v. Texas*,
  311 U.S. 128 (1940) ........................................................ 17

*Taylor v. Louisiana*,
  419 U.S. 522 (1975) ............................................................ *passim*

*United States v. Allen*,
  160 F.3d 1096 (6th Cir. 1998) ........................................ 16

*United States v. Ath*,
  951 F.3d 179 (4th Cir.), *cert. denied,* 140 S. Ct. 2790 (2020) ........................ 29

*United States v. Burgos*,
  94 F.3d 849 (4th Cir. 1996) .............................................. 29

*United States v. Cecil*,
  836 F.2d 1431 (4th Cir. 1988) .................................... 27-28

*United States v. Cole*,
  2022 WL 332083 (N.D. Ohio Feb. 3, 2022) ...................................... 27

*United States v. Elder*,
  2022 WL 835923 (E.D.N.Y. Mar. 21, 2022) .................................... 27

*United States v. Elias*,
  2022 WL 125721 (E.D.N.Y. Jan. 13, 2022) .................................. 27

*United States v. Grisham*,
   63 F.3d 1074 (11th Cir. 1995) ........................................................... 16

*United States v. Habegger*,
   370 F.3d 441 (4th Cir. 2004) ............................................................. 30

*United States v. Hickman*,
   626 F.3d 756 (4th Cir. 2010) ............................................................. 30

*United States v. McMillon*,
   2022 WL 867250 (N.D. Cal. Mar. 23, 2022) ..................................... 27

*United States v. Miller*,
   771 F.2d 1219 (9th Cir. 1985) ........................................................... 16

*United States v. Moses*,
   566 F. Supp. 3d 217 (W.D.N.Y. Oct. 12, 2021) ............................... 27

*United States v. Moye*,
   454 F.3d 390 (4th Cir. 2006) ............................................................. 30

*United States v. Nelson*,
   2022 WL 1093661 (N.D. Cal. Apr. 12, 2022) ................................... 27

*United States v. O'Lear*,
   2022 WL 419947 (N.D. Ohio Feb. 11, 2022) .................................... 27

*United States v. Pritchett*,
   2022 WL 606091 (D.DE. Jan. 28, 2022) ........................................... 26

*United States v. Raszkiewicz*,
   169 F.3d 459 (7th Cir. 1999) ............................................................. 16

*United States v. Sanchez*,
   156 F.3d 875 (8th Cir. 1998) ............................................................. 16

*United States v. Shinault*,
   147 F.3d 1266 (10th Cir. 1998) ......................................................... 16

*United States v. Stockton*,
   349 F.3d 755 (4th Cir. 2003) ............................................................. 29

*United States v. Tresvant*,
   677 F.2d 1018 (4th Cir. 1982) ........................................................... 29

*United States v. Young*,
   609 F.3d 348 (4th Cir. 2010) ............................................................. 29

*Williams v. Florida*,
   399 U.S. 78 (1970) ......................................................................... 17

## Statutes

18 U.S.C. § 1956 ....................................................................... 1, 2

18 U.S.C. § 3231 ........................................................................... 1

21 U.S.C. § 841 ........................................................................ 1, 2

21 U.S.C. § 846 ............................................................................. 2

28 U.S.C. § 1291 ........................................................................... 1

## Other Authorities

Fed. R. Crim. P. 29 ................................................................... 4, 29

Fed. R. Crim. P. 33. ..................................................................... 4

U.S. Const. amend. VI ................................................................ 16

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Appellants, Jose Cruz Colon and Nastassja Lopez-Alvarado, were convicted in the United States District Court for the Eastern District of Virginia, of one count of conspiracy to possess with intent to distribute one kilogram or more of heroin and five kilograms or more of cocaine, in violation of 21 U.S.C. §841(a)(1) and (b)(1)(A), and one count of conspiracy to launder money, in violation of 18 U.S.C. §1956(h). Following the district court's judgments against each defendant on March 21, 2022, Appellant Cruz Colon filed a timely notice of appeal on March 24, 2022, and Appellant Lopez-Alvarado filed a timely notice of appeal on March 25, 2022. The district court had jurisdiction pursuant to 18 U.S.C. § 3231, and this Court has jurisdiction on appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.     Whether the district court's exclusion of all jurors who were unvaccinated for COVID-19 deprived the defendants of their Sixth Amendment right to a jury chosen from a fair cross-section of the community?

II.    Whether the evidence was sufficient to convict Lopez-Alvarado of conspiring to distribute five kilograms of cocaine or more and whether the district court erred in denying her motion for acquittal?

1

## STATEMENT OF THE CASE

### A.    Procedural History

On October 8, 2020, Appellant Jose Cruz Colon ("Cruz Colon") and four others were named in an indictment alleging: 1) Conspiracy to Distribute and Possess with Intent to Distribute One (1) Kilogram or more of Heroin and Five (5) Kilograms or more of Cocaine, Schedule I and II narcotic controlled substances, respectively, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(i) and 846 (4:20cr39). On November 5, 2020, Appellant Nastassja Lopez-Alvarado ("Lopez-Alvarado") was named in an indictment alleging: 1) Conspiracy to Distribute and Possess with Intent to Distribute Five (5) Kilograms or more of Cocaine, Schedule II controlled substance, respectively, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(i) and 846 (4:20cr39). J.A.21. Both pleaded not guilty.

A Superseding Indictment on 4:20cr69 was returned on March 19, 2021, which jointly charged both appellants, who are husband and wife, with two counts. J.A.25-29. Count One charged each with Conspiracy to Distribute and Possess with Intent to Distribute One (1) Kilogram or more of Heroin and Five (5) Kilograms or more of Cocaine, Schedule I and II narcotic-controlled substances, respectively, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(i) and 846. Count Two charged each with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956 (h). Again, both defendants pleaded not guilty.

A Final pretrial conference was held before the Honorable David J. Novak on September 15, 2021. J.A.81-139. At that time, the parties made their strikes for cause of the prospective jury *venire* panel. A jury trial was held in Newport News, Virginia. The jury was selected on September 20, 2021.  J.A.144-309. The trial was held over the next two days, September 21 and 22.

At the conclusion of the government's evidence, Cruz Colon and Lopez-Alvarado made timely motions for judgment of acquittal on both counts. The Court denied those motions. However, as to Lopez Alvarado, the Court concluded that the government had not proven that Lopez Alvarado was involved in a conspiracy to traffic heroin and dismissed that portion of Count One against her. J.A.587-592, J.A.661.

At the conclusion of all the evidence, the jury found both Appellants guilty. J.A.828-831. Cruz Colon was convicted of the two charges in the Superseding Indictment. Lopez-Alvarado, for her part, was convicted of Conspiracy to Distribute and Possess with Intent to Distribute Five (5) Kilograms or more of Cocaine, a Schedule II narcotic-controlled substance, and the Conspiracy to Commit Money Laundering. Sentencing was continued pending the preparation of a Pre-Sentence Report ("PSR").

The Court granted leave to file post-trial motions within 60 days. J.A.822.  On November 21, 2021, both Appellants filed their respective Motions for Acquittal

3

pursuant to Federal Rule of Criminal Procedure (Fed.R.Crim.P.) 29 and Motion for a New Trial pursuant to Fed.R.Crim.P 33. J.A.832-842, J.A.843-851. The next day, on November 22, 2021, the district court denied Appellants' motions. J.A.852-853.

On January 19, 2022, both Appellants filed their respective objections to the PSR. J.A.854-873. The sentencing hearings were held on March 21, 2022. The district court granted Lopez-Alvarado's objection and sentenced her to a mandatory term of 120 months' imprisonment on Count One, a concurrent term of 120 months on Count Two, followed by a term of five years of supervised release and a special assessment. J.A.937-943.  The district court sentenced Cruz Colon to 312 months' imprisonment on Count One, a concurrent term of 240 months on Count Two, followed by a term of five years of supervised release and a special assessment. J.A.944-950. A preliminary forfeiture order was entered as to each Appellant which is not subject to any legal challenge herein.

Cruz Colon filed his notice of appeal on March 24, 2022. J.A.951-952. Lopez-Alvarado filed her notice of appeal on March 25, 2022. J.A.953-954. Both notices were filed timely.

## B.    Statement of the Facts

*The District Court's vaccination requirement*

Prior to trial, the district court ordered the defendants to file a joint position as to whether they were vaccinated against COVID-19, or intended to be by the start

4

of the trial. J.A.57. The court further ordered that the defendants inform the court as to whether they would agree to strike unvaccinated individuals from the jury. *Id.* The defendants responded that they were not vaccinated due to sincerely held beliefs prohibiting them from vaccination, and they did not intend to be vaccinated by the start of the trial. J.A.58. However, they agreed that prior to and during trial, they would test for COVID-19 and provide the test results to the court. *Id.* The defendants objected to the court's suggestion of striking unvaccinated jurors for cause. J.A.59. The government took no position on striking unvaccinated jurors. J.A.61.

*Jury Selection*

To reduce in-person contact during the COVID-19 pandemic, the district court directed the clerk of the court to send a jury questionnaire to prospective jurors that the parties and the court would use to strike jurors for cause without their physical presence. J.A.41. The questionnaire included eight questions regarding COVID-19, including the prospective juror's vaccination status, potential exposure to COVID-19 through travel or work, and any risk factors for serious complications from COVID-19. J.A.49-50.

During a pre-trial conference on September 15, 2021, the parties convened to strike potential jurors based on their answers to the written questionnaire. J.A.81. The district court struck all potential jurors who indicated that they were not vaccinated. Four of the unvaccinated individuals had alternate reasons that could

account for being stricken: two unvaccinated jurors were traveling close to the time of trial and were treated as carrying a greater risk of exposure to COVID-19, J.A.86-87, J.A.92; one unvaccinated juror had been diagnosed with COVID-19 approximately four weeks before the start of the trial, J.A.90; and one unvaccinated juror was struck because he had diabetes and was unable to stay awake, J.A.90-91. The defense requested that the two jurors who were travelling be stricken, and did not object to the other two being stricken.

However, counsel for Alvarado-Lopez, Fernando Groene, objected to striking one juror based solely on his unvaccinated status. J.A.93. Mr. Groene argued that the defendants were entitled to a representative sample of their peers, and that the defendants themselves were not vaccinated. *Id.* The district court overruled the objection, reasoning that being unvaccinated is not a protected class as in a *Batson*[1] challenge, and that the defendants were not entitled to have unvaccinated people on the jury. *Id.* The court noted the risk of contracting COVID-19 with the rise of the Delta variant and was concerned that jurors would be unmasked during lunch. J.A.94-95.

Mr. Groene clarified that he was not raising a *Batson* issue, but argued that striking unvaccinated individuals excluded a section of potential jurors. J.A.96. Nevertheless, the objection was overruled. J.A.98. Cruz Colon joined in the

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

6

objection to striking unvaccinated jurors, and the district court acknowledged that the objection was preserved as to both defendants. J.A.108-109.

The district court issued an order striking jurors for cause as determined at the September 15, 2021, pretrial conference. J.A.140. The remaining 47 prospective jurors were randomized and divided into three panels of 14 and one panel of 5, to appear in person for jury selection on September 20, 2021. *Id.*

Jury selection was held in person on September 20, 2021. During *voir dire*, the court discovered another juror who was unvaccinated, and whose mother had health issues. J.A.200-201. Over defense objection, the court struck the juror, citing a health risk to the juror and to everyone in court. *Id.* The case proceeded to trial with all unvaccinated individuals stricken from the petit jury.

*The trial evidence*

Appellants were charged with conspiring to variously distribute drugs and to commit money laundering. Seven law enforcement officers testified in this case. Also significant was the extensive testimony of DEA Task Force Officer ("TFO") Lionel Jackson, and several other agents, who monitored the wiretaps. TFO Jackson was also accepted by the court as an expert in narcotics investigations. J.A.636. He testified that drug conversations are generally vague and use coded terminology. The remaining law enforcement agents testified to their individual roles in running the wiretap intercepts, surveillance, and collection of evidence. These witnesses

provided supporting background about the investigation; however, the government's main evidence against Cruz Colon consisted of the testimony of Lee Curtis Spears. Critically, the government's only evidence against Lopez-Alvarado was confined to the testimony of Spears. J.A.131-469.

Spears testified to his long history of drug dealing and resulting incarcerations. J.A.196; J.A.208-209; J.A.444-450. Spears testified to obtaining a job at the shipyard where he met the owner Jamie Rivera and was later recruited to distribute drugs for him. J.A.372. Spears testified to being introduced to Cruz Colon through Rivera but gave vague testimony as to knowing Cruz Colon was the source of supply but not dealing with him directly. Spears testified he first heard of Cruz Colon in 2018 but did not meet him until 2019. J.A.376-377. During that time Spears continued to only deal with Rivera but described his first meeting with Cruz Colon regarding two (2) counterfeit hundred dollar bills. J.A.379-80. Spears does not describe this conversation with Cruz Colon as ever referencing drugs and only the need to be careful to avoid counterfeit bills. Spears testified to obtaining cell phones for himself, Rivera, and Cruz Colon; however, Spears did not testify to any discussions about the purpose of the telephones and continued dealing only with Rivera. J.A.379-380.

Spears also testified that Jamie Rivera became addicted to opioids. J.A.370-373. Jamie Rivera went to a rehabilitation program around March 2019. J.A.384-

386. Spears testified that Rivera directed him to move two (2) remaining kilograms of cocaine and deliver the proceeds to Cruz Colon. J.A.386-387. Spears testified to attempting contact with Cruz Colon but not speaking with him and instead dealing with Jamie Rivera's brother, George Rivera. J.A.389-391. Spears contradicted himself when asked who gave him the money. Initially, Spears testified to giving George Rivera his drug proceeds; then, he changed his testimony to say that, instead, he gave the money to Cruz Colon. J.A.392.

Spears testified to his dealing with Cruz Colon resulting in approximately ten (10) kilograms of cocaine. J.A.435. Spears testified to obtaining one-half (500 grams) of a kilogram of green heroin from Jamie Rivera. J.A.398-399. Although Spears may have believed that Rivera had another one-half (500 grams) of the green heroin to sell, he never testified to seeing this additional 500 grams. Spears testified he exchanged the said one-half (500 grams) kilogram of green heroin for brown heroin. J.A.435. Spears testified generally to being propositioned by someone to purchase nine (9) ounces of heroin but that never came to fruition. J.A.415. Spears testified that although the various telephone calls and messages with Cruz Colon involved drugs, their actual transactions were sporadic. J.A.413-414.

Spears testified that he met Cruz Colon in about March 2019 through Jaime Rivera. Spears testified he dealt cocaine and heroin with Rivera, Ted Velez and his redistributors, which he called buffers. Spears did not claim Lopez-Alvarado had

any relationship or illegal dealings with Rivera or Ted Velez. Further, the government presented no evidence through Spears that she was even aware of the illegal activities of these two men. J.A.385-395. Likewise, the government presented no evidence that Lopez-Alvarado participated in a conspiracy to distribute heroin and the Court properly struck that goal of the conspiracy as to her. J.A.587-592; J.A.661.

Spears claimed that during that entire period in which he dealt with Cruz Colon, Lopez-Alvarado personally delivered to him two kilograms of cocaine. J.A.435-436. Critically, Spears' testimony is imprecise and mostly speculative. His actual testimony was that he received "probably about" but "for sure" two kilograms of cocaine from Lopez-Alvarado. J.A.435. Then he simply equivocated as to how many times, during the entire time when he dealt with Cruz Colon, he observed Lopez-Alvarado present. At first, he said that Lopez-Alvarado was present with Cruz Colon but later, and when pressed for specifics, continued to equivocate by qualifying his testimony by saying that he "probably" met with Lopez-Alvarado a grand total of 4 or 5 times which included the times he either picked up drugs or dropped off money – and the two previous times where he obtained a total of 2 kilograms. J.A.436. He was clear that not every encounter with Cruz Colon involved cocaine pickups. J.A.436. There is no evidence that Lopez-Alvarado knew the precise or even ballpark quantities of cocaine in which that Spears and Cruz Colon

10

were dealing. Even on the time where she answered Spears' call to Cruz Colon. J.A.344.

Spears speculated or, as he testified, he "[woul]d say" Lopez-Alvarado was present two times during some conversations in which he and Cruz Colon discussed (drug) prices. J.A.419-420. Spears went on to say that Lopez-Alvarado "chimed in" about a $3,000 difference in money owed by someone. It is unclear whether Spears or Cruz Colon owed the money. J.A.421. However, Spears' testimony was not precise as to the timing of those conversations in which he claimed Lopez-Alvarado participated or what amounts of drugs or money were being discussed. Reviewing the government's evidence, in its best light, it is entirely possible that those conversations where the ones in which Spears claims that Lopez-Alvarado delivered a kilogram of cocaine to him - a total of 2 times by his testimony - or on August 19, 2019, when Spears claims he delivered an unknown amount of money to her at the door of the apartment. J.A.436.

Spears said that he owed Rivera $66,000 for drugs and had to pay it to Cruz Colon for two kilograms of cocaine. J.A.395. Spears admitted that he had spoken with Lopez-Alvarado but not too much because he did not "approve" of her involvement. J.A.395-96. Later, under cross-examination, Spears admitted that he never had phone discussions about drugs with Lopez-Alvarado. J.A.460. Moreover, Spears admitted that all dealings he had with Lopez-Alvarado were at the direction

11

of someone else. J.A.467. This would include the call he made to Cruz Colon in October 2019 and Lopez-Alvarado answered. J.A.426. It would include the single time he testified delivering money to her – at least $22,000 - at the door of her apartment on August 19, 2019. J.A.401-402; J.A.405; J.A.412-413. Spears testified he did not count the money in front of or with Lopez-Alvarado nor did he inform her of how much money he was delivering. J.A.413. The government did not present any evidence that Lopez-Alvarado knew the amount of money Spears had delivered or for what amount of cocaine it was supposed to be in payment.

Other witnesses also testified at trial. FBI Special Agent Robert Bishop testified that during the 1 ½ years on this wiretap investigation he never listened to a conversation between Cruz Colon and Lopez-Alvarado involving any illegal activity. J.A.484. DEA TFO Martin Zelada testified that on August 20, 2019, while on surveillance, he observed Lopez-Alvarado arrive at her apartment and a short time later, exit carrying a white box to the post office and mail said box. J.A.496-500; J.A.515-517. DEA TFO Natiello documented that Lopez-Alvarado came to the apartment and, soon thereafter, left for the post office, mailed a package, and left the post office. It was a quick turnaround. J.A.525-526.

Richmond Airport Police Officer Paul Hope testified that in December 2019, Lopez-Alvarado and her husband were traveling and approximately $23,000 in cash was found in a passenger suitcase; presumably one of the travelers' suitcases. Hope

never explained in whose suitcase was the money found or whether the source of the money itself was illegal. J.A.532-539. This does not support the government's theory that this money was money from selling heroin or cocaine. Likewise, Officer Hope's testimony does not provide any proof that Lopez-Alvarado had any knowledge that Cruz Colon dealt in more than 5 kilograms of cocaine.

United States Postal Inspector Thomas Sylvester testified that he recovered packages with cocaine and tracked other packages mailed in connection with this investigation. At no time, did he testify about Cruz Colon being found with packages known to contain cocaine or heroin. J.A.577.  Inspector Sylvester testified that a package that was seized containing the name Luis Cruz, but also admitted to Cruz being a common name seen on many packages. J.A.556-457; J.A.577. He did not testify that he discovered any package, either through being intercepted in the mail flow or through his investigation of records of mailed packages, that was addressed to Lopez-Alvarado – either by her true name or by a combination of her true name. J.A.556. He testified that Lopez-Alvarado mailed a package to Puerto Rico on August 20, 2019. J.A.579; J.A.551. The government's assumption is that the package contained money. Critically, said package was not opened and no one was able to testify what it contained. J.A.579-581. No one knows who packaged and sealed the box. No one knows if there was any money inside. Even assuming that there was money inside the package, no one testified that Lopez-Alvarado knew how

much money was there. Assuming that there was money inside the white box, and further if this money came from Spears' delivery the night before, no one could refute the fact that this (drug) money did not come as payment for the cocaine (one kilogram a total of 2 times) that Spears testified Lopez-Alvarado had given to him. Then the money would have, presumably, come from one of the 4 or 5 times that Spears testified he was in the presence of Lopez-Alvarado.

The only other non-law enforcement witness called at trial was Juliet H. Gamez, who testified to knowing Cruz Colon through her husband, co-conspirator Ervin Martin Cartagena. J.A.616. Gamez testified to receiving parcels at her home for Cruz Colon. J.A.617. Cartagena did not testify at trial. Gamez did not testify to opening any of these alleged packages. Gamez further testified that Cruz Colon would come to the house to pick up money or drop off drugs. J.A.624. She does not describe any specifics and instead speculates that drugs were present. Critically, Gamez testified that she never saw Lopez-Alvarado engage in any drug activities. Not even in those alleged drug activities where Cruz Colon participated with her and with Cartagena. J.A.624-625. In fact, Juliet Gamez testified that she saw Lopez-Alvarado twice when she came by her house to meet her baby and to drop off milk and diapers. J.A.625-27.

TFO Jackson, the drug expert, testified that Spears and Cruz Colon engaged in telephone conversations where they discussed drug amounts and prices. Lopez-

14

Alvarado did not participate on those. J.A.635-646. Lopez-Alvarado was at work while Cruz Colon was at home. J.A.638-640; J.A.649-650. He testified that Spears called Cruz Colon's phone and Lopez-Alvarado answered his phone. J.A.651-652.

The Court instructed the jury with Jury Instruction 40 and Jury Instruction 51 dealing with their finding regarding drug weights. J.A.711-712; J.A.718-720.

## SUMMARY OF THE ARGUMENT

In an attempt to reduce the risk from COVID-19, the district court excluded for cause, all unvaccinated jurors from the petit jury. Of the six unvaccinated jurors identified in the *venire*, four were struck for reasons other than vaccination status. However, two jurors were struck because of their unvaccinated status. In so doing, the district court deprived the defendants of their Sixth Amendment right to a jury chosen from a fair cross-section of the community.

The evidence presented by the government at trial did not show that Lopez-Alvarado conspired to possess with intent or to distribute five (5) or more kilograms of cocaine. The district court erred in denying Lopez-Alvarado's motion for acquittal regarding whether the government had proved that threshold amount. The evidence against Lopez-Alvarado supported a guilty finding for conspiring to distribute between 500 and 5,000 grams of cocaine.

**ARGUMENT**

I.   **Striking Unvaccinated Jurors Deprived the Defendants of Their Constitutional Right to a Jury Chosen from a Fair Cross-Section of the Community.**

   A.   **Standard of Review**

   This Court does not appear to have published a case directly addressing the standard of review as to a violation of the fair cross-section requirement. However, other circuits have applied *de novo* review under the reasoning that it presents a mixed question of law and fact, *see e.g.*, *United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir. 1998); *United States v. Raszkiewicz*, 169 F.3d 459 (7th Cir. 1999); *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998); *United States v. Miller*, 771 F.2d 1219, 1227 (9th Cir. 1985); *United States v. Grisham*, 63 F.3d 1074, 1077 (11th Cir. 1995); or because the question of whether a prima facie violation of the fair cross-section requirement has occurred, is a legal determination. *See United States v. Shinault*, 147 F.3d 1266, 1271 (10th Cir. 1998).

   B.   **The Sixth Amendment's Fair Cross-Section Requirement**

   The Sixth Amendment of the U.S. Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . " U.S. Const. Amend. VI. An essential component of the "impartial jury" requirement is that the petit jury be drawn from a fair cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 528, (1975).

16

As early as 1940, the Supreme Court stated that, "[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community" *Smith v. Texas*, 311 U.S. 128 (1940) (holding that the systematic exclusion of black jurors violated the Equal Protection Clause of the Fourteenth Amendment).

To achieve a fair cross-section of the community, the Sixth Amendment not only prohibits the exclusion of particular segments of the population, but mandates that the number of persons on the jury should "be large enough to promote group deliberations free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community." *Williams v. Florida*, 399 U.S. 78 (1970).

The Supreme Court addressed the fair cross-section requirement in detail in *Taylor*, which examined the constitutionality of a Louisiana State law excluding women from jury service unless they had previously filed a written declaration indicating her desire to be included in jury service. Finding the law unconstitutional, the Court stated, "[w]e accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment . . . " 419 U.S. at 530. The Court explained that the fair cross-section requirement serves two distinct purposes. First, the fair cross-section requirement guards against arbitrary power:

> The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the

17

> community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge . . . This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool.

*Id.* 419 U.S. at 530. Moreover, the fair cross-section requirement promotes confidence in the fairness of the criminal justice system:

> Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial.

*Id.*

The Court furthermore rejected the state's argument that the law could be sustained upon a rational basis—that jury service would interfere with women's distinctive role in society. A higher standard was required because "[t]he right to a proper jury cannot be overcome on merely rational basis grounds. *Id.*, 419 U.S. at 533-34.

In *Duren v. Missouri*, 439 U.S. 357 (1979), the Supreme Court set forth a framework for raising fair cross-section claims. First, the defendant has the burden to establish a prima facie violation by showing: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in *venires* from which juries are selected is not fair and reasonable in relation to the

number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Id.*, 439 U.S. at 364.

Once the defendant makes a prima facie showing of an infringement of a constitutional right to a jury drawn from a fair cross-section of the community, the government bears the burden of justifying the infringement by showing that attaining a fair cross-section is incompatible with a significant state interest. *Duren*, 439 U.S. at 367-68. The Court reiterated that the rational basis standard was insufficient; "[r]ather, it requires that a significant state interest be manifestly and primarily advanced by those aspects of the jury selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* The court cautioned that "the constitutional guarantee to a jury drawn from a fair cross section of the community requires that States exercise proper caution in exempting broad categories of persons from jury service." *Duren*, 439 U.S. at 370.

## C. The District Court's Elimination of all Unvaccinated Jurors Violated the Fair Cross-Section Requirement of the Sixth Amendment

In an effort to curb the risk from COVID-19, the district court ordered that the defendants reveal their vaccination status prior to trial. J.A.57. The defendants responded that, "they are not vaccinated and have no current plans to be vaccinated prior to the September 20, 2021, trial date. The defendants submit that they have sincerely held beliefs which prohibit them from being vaccinated." *Id.* However, the

defendants agreed to test for COVID-19, to provide the test results to the court, and to follow all of the court's safety precautions. *Id.*

The district court ordered that the defendants test for COVID-19 on the following dates: September 14, 2021, one day prior to the final pretrial conference; September 17, 2021, the Friday prior to jury selection scheduled for September 2021; September 20, 2021, in the afternoon following jury selection; and September 22, 2021, either before or after trial. J.A.63-64. The defendants were ordered to submit their test results to the court. *Id.* In the alternative, the defendants could avoid testing by receiving the COVID-19 vaccine and presenting their vaccination cards to the court. *Id.* The defendants chose to remain unvaccinated and follow the court's testing requirements.

The district court also solicited the parties' positions on striking all unvaccinated jurors, J.A.57, to which the defendants unequivocally objected. J.A.59. During the pre-trial conference on September 15, 2021, the parties convened to consider preliminary strikes for cause based on responses to the jury questionnaire. Five prospective jurors indicated that they were not vaccinated. J.A.86-87, J.A.90-91, J.A.92, J.A.93. The defense did not object to striking four of these prospective jurors because there were other reasons to strike them for cause.[2] However, the

---

[2] Juror 29 was not vaccinated and planned to travel to Los Angeles close to the time of trial, J.A.86-87; Juror 76 was not vaccinated and had contracted COVID-19 on August 24, 2021, approximately one month before the start of trial, J.A.90;

defense objected to striking Juror 11, who was unvaccinated and who the court struck for no other reason. J.A.92-93. The remaining jurors were summoned to appear in court for *voir dire*. During in-person *voir dire* of the remaining jurors on September 20, 2021, an additional juror was found to be unvaccinated and was struck over defense objection. J.A.200-201. The district court's elimination of all unvaccinated jurors deprived the defendants of their Sixth Amendment right to a jury drawn from a fair cross-section of the community.

The defendants established a prima facie case of a Sixth Amendment violation under the factors set forth in *Duren*. First, unvaccinated members of the community constitute a distinctive group, which the court singled out for different treatment. Neither the Supreme Court nor this Court has precisely defined the term, "distinctive group. *See Lockhart v. McCree*, 476 U.S. 162 (1986) (stating "[w]e have never attempted to precisely define the term 'distinctive group'"). However, the Court in *Lockhart* instructed, "we think it obvious that the concept of 'distinctiveness' must be linked to the purpose of the fair-cross section requirement." *Id.* at 174. The Court then restated the purposes identified in *Taylor*, 419 U.S. at 530-31. These purposes include:

> (1) guard[ing] against the exercise of the arbitrary power' and ensuring that the 'commonsense judgment of the community' will act as 'a hedge

---

Juror 82 was not vaccinated and struggled to stay awake because of diabetes, J.A.91-92; Juror 110 was not vaccinated and planned to travel to Florida prior to the start of the trial, J.A.92.

> against the overzealous or mistaken prosecutor," (2) preserving 'public confidence in the fairness of the criminal justice system,' and (3) implementing our belief that 'sharing in the administration of justice is a phase of civic responsibility.

*Lockhart*, 476 U.S. at 174-75 (quoting *Taylor*, 419 U.S. at 530-31 (1975)). All three of the purposes of the fair-cross section requirement are implicated by striking unvaccinated jurors. The defendants were deprived of the commonsense judgment of people who, like them, were unvaccinated. Precluding all unvaccinated individuals from jury service erodes public confidence in the criminal justice system—particularly in the population of unvaccinated individuals—of which the defendants are a part. Third, unvaccinated individuals are deprived of their civic responsibility of serving on a jury.

To be sure, the unvaccinated group is not monolithic. But there is no requirement to show that this group would behave as such. In *Taylor*, the Supreme Court rejected the argument that women did not act as a class:

> Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise to not act as a class. But, if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel? The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded.

*Taylor*, 419 U.S. at 531-32. The same reasoning applies in this case. Even if the unvaccinated comprise a diverse group, it is axiomatic that "a community made up exclusively of one is different from a community comprised of both." *Id.* To exclude all unvaccinated individuals as a group—a group to which the defendants belonged—violates their Sixth Amendment right to a jury chosen from fair cross-section of the community.

The second *Duren* factor—that the representation of unvaccinated jurors is not fair and reasonable in relation to the number of such persons in the community—is easily met. Within the jury pool in this case, six jurors were identified as being unvaccinated, and all were excluded from the petit jury.

The third *Duren* factor—that the underrepresentation is due to systematic exclusion of the group in the jury selection process—is again easily met because the district court purposely struck all unvaccinated jurors.

After the defendants make a prima facie showing, the government bears the burden of justifying the constitutional infringement by showing that attainment of a fair cross-section is incompatible with a significant state interest. *See Duren*, 439 U.S. at 368. In the district court, the government took no position regarding the court's exclusion of unvaccinated jurors. J.A.61. The court reasoned, however, that the risk of spreading COVID-19 would be reduced if unvaccinated jurors were stricken.

The district court was concerned that infections from COVID-19 were rising rapidly. J.A.94. The court cited an anecdotal example of a three-week trial in which one of the jurors contracted COVID-19, and the trial was suspended while everyone was tested. J.A.95. The court reasoned that jurors would be in close confinement with each other, and they would have to remove their masks during lunch to eat and drink. J.A.94-95. Furthermore, the case was being tried in a smaller courthouse with more space constraints. J.A.95-96.

The reasons given by the district court for striking all unvaccinated jurors fail to establish a significant state interest. The district court's COVID-19 concerns could have been addressed without infringing on the defendants' Sixth Amendment rights. At the time of trial, the district court required all persons in the courthouse to wear a mask and to maintain a distance of at least 6 feet from each other whenever possible. *See* United States District Court for the Eastern District of Virginia, General Order No. 2021-11. The court's concern that jurors would be unmasked during lunch could have been mitigated by sending the jurors outdoors for lunch.

Testing could have been implemented to address any increased risk from unvaccinated individuals. The defendants, for example, agreed to test regularly. Likewise, a test could have been requested of the unvaccinated jurors prior to trial. To be even safer, the court could have asked all of the jurors to test. One test would have been sufficient for the entire trial, which was completed in two days.

24

The district court furthermore refused to consider that the relative risk presented by unvaccinated jurors compared to vaccinated jurors depended on the individual circumstances of each juror. For example, the court declined to consider whether the unvaccinated jurors might have already contracted COVID-19 and obtained natural immunity. J.A.98. The court also rejected the defense argument that even vaccinated jurors may still present a heightened risk due to living or working with unvaccinated individuals. J.A.96-97. The district court acknowledged that there were a lot of unknowns, but that it would err on the side of health. J.A.98.

Depriving the defendants of a fair cross-section of jurors from the community was not justified by the court's interest in reducing the risk of COVID-19. The court declined to gather more information from each juror to assess individual risk factors. Instead, it employed a very blunt instrument that deprived the defendants of their constitutional right to a jury chosen from a fair cross-section of the community. As stated in *Duren*, "the constitutional guarantee to a jury drawn from a fair cross-section of the community requires that the States exercise proper caution in exempting broad categories of persons from jury service." 439 U.S. at 370.

Undersigned counsel was unable to find a case in this or any other circuit regarding the constitutionality of excluding unvaccinated jurors. However, a court in District of Delaware recognized the importance of the fair cross-section requirement when rejected the government's request to limit the jury pool to

vaccinated individuals. *See United States v. Pritchett*, 2022 WL 606091 (D.DE. Jan. 28, 2022) (Dist. Case No. 18-cr-75). As that court stated, "[w]hile it is easy to invoke the trope of 'health' to justify intrusions on liberty, such as limits on jury trials or the eligible members of a jury pool, the Supreme Court has indicated that the Constitution provides a bulwark against those intrusions: '[E]ven in a pandemic, the Constitution cannot be put away and forgotten.'" *Id.* (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 68 (2020)). The court found that the government's request to exclude all jurors who were not up to date on their COVID-19 vaccines would exclude nearly 2/3 of potential jurors. *Id.*

The district court in *Pritchett* furthermore recognized the fundamental right of citizens to participate in jury trials. *Id.* "Depriving an individual of such a civic duty, without an opportunity to serve, requires a weighty showing. But neither the Court nor the Parties knows how excluding a substantial portion of the jury pool would alter the pool." *Id.* The court denied the government's motion to exclude jurors who were not "up to date" on their COVID-19 vaccine and ruled that it would wait until *voir dire* to better determine how exclusion of unvaccinated jurors would impact the make-up of the petit jury. *Id.* at *2.[3]

---

[3] The case did not proceed to *voir dire* because the defendant pleaded guilty prior to trial.

In contrast to the reasoning in *Pritchett*, most district courts that have examined the issue have upheld vaccination requirements. But in most of these cases, objections to a vaccination requirement have been argued based on the racial disparity in vaccination rates. *See United States v. Cole*, 2022 WL 332083, (N.D. Ohio Feb. 3, 2022) (Dist. No. 20-cr-424); *United States v. Elder*, 2022 WL 835923, (E.D. N.Y. Mar. 21, 2022), (Dist. No. 18-cr-92); *United States v. Elias*, 2022 WL 125721 (E.D.N.Y. Jan. 13, 2022) (Dist. No. 18-cr-33); *United States v. Moses*, 566 F. Supp.3d 217 (W.D.N.Y. Oct.12, 2021) (Dist. No. 19-cr-06074); *United States v. Nelson*, 2022 WL 1093661 (N.D. Cal. Apr.12, 2022) (Dist. No. 17-cr-533); *United States v. McMillon*, 2022 WL 867250 (N.D. Cal. Mar. 23, 2022) (Dist. No. 20-cr-242); *United States v. O'Lear*, 2022 WL 419947 (N.D. Ohio Feb. 11, 2022) (Dist. No. 19-cr-349). In this case, however, the defendants raise an objection that is not limited to an argument about discrimination against a protected group. The objection is broader—arguing that the targeted exclusion of unvaccinated jurors violates the fair cross-section requirement of the Sixth Amendment.

Defendants urge this Court to consider the well-reasoned opinion in *Pritchett* to hold that the district court's vaccination requirement violated their Sixth Amendment right to a jury drawn from a fair cross-section of the community. While this Court may not have addressed the specific issue of excluding unvaccinated jurors, it has set forth principles upon which to review such a question. In *United*

*States v. Cecil*, 836 F.2d 1431, 1445 (4th Cir. 1988), this Court addressed a challenge to using voter registration lists as the source from which jurors were randomly selected. While upholding use of voter registration lists, this Court stated that the constitution does not require *venires* to be a mirror of the community, but that active discrimination is prohibited. *Id.* at 1445-46. "Because a true cross section is practically unobtainable, courts have tended to allow a fair degree of leeway in designating jurors so long as the state or community does not *actively* prevent people from serving or actively discriminate, and *so long as the system is reasonably open to all*." (quoting *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir. 1985) (*en banc*), *cert. denied*, 475 U.S. 1050 (1986) (first emphasis in the original, second emphasis added by this Court in *Cecil*).

In this case, the record establishes that two jurors were actually excluded from the petit jury because they were unvaccinated. This was in addition to four unvaccinated individuals who had alternative reasons for being stricken. The striking of all unvaccinated jurors runs afoul of the principle that a jury system must be "reasonably open to all." *Cecil*, 836 F.2d at 1445. The district court's justification, to lower the risk of COVID-19, was insufficient, given available alternatives, and its failure to consider the circumstances of each juror individually. Accordingly, a new trial is required.

## II. There was Insufficient Evidence To Convict Lopez-Alvarado for of Conspiracy to Distribute More than Five Kilograms of Cocaine And The District Court Erred In Denying Lopez-Alvarado's Motion for Acquittal

### A. Standard of Review

This Court reviews the district court's denial of judgments of acquittal *de novo*. *United States v. Ath*, 951 F.3d 179, 185 (4th Cir.), *cert. denied*, 140 S. Ct. 2790 (2020). Denial of a Rule 29 motion should be affirmed on appeal if, "viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982).

### B. Discussion

#### There is insufficient evidence to prove that it was foreseeable for Lopez Alvarado that the conspiracy involved more than five (5) kilograms of cocaine

Where a defendant challenges the sufficiency of the evidence supporting a conviction, this Court reviews the evidence in the light most favorable to the government and upholds the verdict if substantial evidence supports it. *United States v. Stockton*, 349 F.3d 755, 760-61 (4th Cir. 2003). Substantial evidence is that which, taking all inferences in the government's favor, could lead a rational jury to find the evidence sufficient for a conviction. *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996). A defendant challenging the sufficiency of evidence "faces a heavy burden," *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010), and this Court

will reverse only where the prosecution's failure is clear. *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006).

Challenging the sufficiency of the evidence to support a jury verdict is a heavy burden but not insurmountable. *United States v. Habegger,* 370 F. 3rd 441, 444-45 (4th Cir. 2004).  Accordingly, even viewing the evidence in the light most favorable to the government, there is insufficient credible evidence to support the verdict's finding regarding the drug amount as it relates to Lopez Alvarado on Count 1, the Drug Conspiracy count.

There may be substantial evidence that Lopez Alvarado participated in a conspiracy, with her husband, to possess with intent to distribute and to distribute cocaine. However, the evidence about her knowledge and involvement in the conspiracy to possess with intent to distribute and to distribute more than 5 kilograms is lacking. The government, by Spears' testimony alone, cannot – and was not able to – prove that Lopez-Alvarado participated in a conspiracy to distribute more than 5 kilograms of cocaine. *United States v. Hickman*, 626 F.3d 756, 762 (4th Cir. 2010).   It was undisputed at trial that any participation by Lopez-Alvarado in this criminal endeavor was much lesser than that of her husband. For instance, the government was unable to provide any evidence showing that Lopez Alvarado participated in any aspect of the conspiracy with regards to the distribution or possession of heroin.

30

Regarding Lopez-Alvarado's participation in the drug conspiracy, Spears testified he saw Lopez-Alvarado a total of between 4 or 5 times. During those times, he claimed that he variously, delivered drug money to her (although he admitted he never saw her count any money), obtained a total of no more than two kilograms of cocaine from her, she was present during price discussions he was having with Cruz Colon, she weighed in to straighten a drug debt between him and Cruz Colon and one single time - throughout the course of the entire investigation which included Title III intercepts and the cooperation of knowledgeable involved parties like Spears, Cartagena and Juliet Gamez – Lopez Alvarado answered Cruz Colon's phone and stated that "we have something for you." J.A.344.

It is undisputed that, except for one call between Spears and Lopez-Alvarado, there were no wiretap intercepts involving Lopez-Alvarado and her husband or anyone discussing narcotics or money transactions or showing her involvement or the extent of her participation and knowledge in the narcotics conspiracy. J.A.426-427; J.A.468. In that one conversation introduced in evidence as Government Exhibit 109, Lopez-Alvarado can be heard answering Spears' call to her husband's cellphone and saying, "we have something for you." J.A.344. During the call neither Spears nor Lopez-Alvarado mention any drug quantities, price, money owed, etc. Even if the conversation is, as Spears testified, drug-related, there is no evidence, from this conversation, that Lopez Alvarado was aware what quantity of drugs he or

31

"we" have for Spears. Spears never testified to any drug amount in that conversation or what quantity he was seeking to get. In fact, the evidence before the jury was that when Cruz Colon is setting up drug deals – with his supplier or with his "buffer" Spears – Lopez-Alvarado was at work, that she was unaware of the specifics of his cocaine dealings and that he used her as an occasional or default transportation resource. J.A.638-640; J.A.649-650.

As stated in the rendition of facts presented here, there is insufficient evidence, as a matter of law, for a jury to conclude that the government proved that Lopez Alvarado could foresee that the conspiracy alleged in Count One involved five kilograms of cocaine or more. There was no credible evidence presented that she herself conspired with Cruz Colon to traffic in five or more kilograms of cocaine. The only evidence introduced by the government about the total of Lopez-Alvarado's involvement in the conspiratorial activities charged in the Superseding Indictment leads us squarely to the testimony of Curtis Lee Spears. A close examination of Spears' testimony, when answering the questions posed to him by the government, the defense counsel, and the district court, clearly shows that there is insufficient evidence to support a verdict, beyond a reasonable doubt, that Lopez-Alvarado conspired to distribute more than five kilograms of cocaine. Affording Spears' testimony all the deference the law gives it only proves that Lopez-Alvarado conspired to distribute more than two (2) – not more than five (5) – kilograms of

cocaine. Therefore, for the foregoing reasons, Appellant Lopez-Alvarado respectfully requests this Court vacate the verdict on the conspiracy count as to the five (5) kilogram cocaine amount and enter a verdict that the government proved, beyond a reasonable doubt, that the defendant was responsible for more than 500 grams but less than 5,000 grams of cocaine.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request this Court vacate their convictions and remand to the district court for a new trial. In the alternative, Appellant Lopez-Alvarado requests that this Court vacate the conviction on Count 1 as to her of possession with intent to distribute and distribution of five (5) kilograms or more of cocaine and remand the case to the district court for resentencing.

Respectfully Submitted,

S/*Sicilia C. Englert*          S/*Fernando Groene*
Sicilia C. Englert              Fernando Groene
LAW OFFICE OF            FERNANDO GROENE, PC
SICILIA C. ENGLERT, LLC     364 McLaws Circle, Suite 1A
1800 Diagonal Road, Suite 600   Williamsburg, VA 23185
Alexandria, VA 22314        757-603-6173
703-636-2261               Counsel for Appellant
Counsel for Appellant       Nastassja Lopez-Alvarado
 Jose Cruz Colon

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This Opening Brief of Appellant has been prepared in a proportionally spaced
typeface using Microsoft Word, Times New Roman, 14 point.

2.    Exclusive of the table of contents; table of citations; certificate of compliance
and the certificate of service, this Opening Brief of Appellant contains <u>7,835</u>
words.

3.    I understand that a material misrepresentation can result in the court's striking
the brief and imposing sanctions.  If the Court so directs, I will provide an
electronic version of the brief and a copy of the word or line printout.


<u>S/*Sicilia C. Englert*</u>
Sicilia C. Englert

34

## **CERTIFICATE OF SERVICE**

I certify that, on July 25, 2022, I electronically filed the foregoing Opening Brief of Appellant with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

I further certify, that on July 25, 2022, I served Joint Appendix Sealed Volumes III and IV, via USPS, on counsel listed below:

Eric M. Hurt
Julie Podlesni
Assistant U. U. Attorneys
OFFICE OF THE UNITED STATES ATTORNEY
721 Lakefront Commons, Suite 300
Newport News, VA 23606


S/*Sicilia C. Englert*
Sicilia C. Englert