IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

Nos. 22-4187, 22-4192

———————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

JOSE CRUZ COLON AND NASTASSJA LOPEZ-ALVARADO,

*Appellants*.

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Newport News
*The Honorable David J. Novak, District Judge*

———————————

BRIEF OF THE UNITED STATES

———————————

Jessica D. Aber
United States Attorney

Julie D. Podlesni
Eric M. Hurt
Assistant United States Attorneys
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
(757) 591-4000

*Attorneys for the United States of America*

# Table of Contents

**Page**

Table of Authorities ......................................................................... ii

Issues Presented ............................................................................... 1

Statement of the Case........................................................................ 1

    A.    Investigation into the Rivera Drug Trafficking Organization............... 1

    B.    The impact of Covid-19 on jury selection and trials............................ 9

    C.    Evidence presented at trial. ............................................................. 12

Summary of Argument ...................................................................... 23

Argument........................................................................................... 24

I.    Defendants never argued in the district court or on appeal that the Jury Service and Selection Act, 28 U.S.C. § 1861 *et seq.*, was violated and have waived any such claim, relying instead solely on a constitutional fair cross-section challenge to the trial jury .................................................. 24

II.    Defendants failed to make a prima facie showing of a Sixth Amendment fair-cross-section violation. ........................................................ 28

III.    Substantial evidence supported the jury's finding of guilt as to defendant Lopez-Alvarado. ........................................................... 34

Conclusion ....................................................................................... 39

Statement Regarding Oral Argument ................................................... 40

Certificate of Compliance ................................................................. 40

# Table of Authorities

**Page**

## Cases

*Barber v. Ponte*, 772 F.2d 982 (1st Cir. 1985) (en banc) .........................................32

*Batson v. Kentucky*, 476 U.S. 79 (1986)...................................................................30

*Berghuis v. Smith*, 559 U.S. 314 (2010) ...................................................................29

*Buchanan v. Kentucky*, 483 U.S. 162 (1986).............................................................32

*Duren v. Missouri*, 439 U.S. 357 (1979) ...................................................................29

*Joffe v. King & Spalding LLP*, 575 F. Supp. 3d 427 (S.D.N.Y. 2021)....................25

*Lockhart v. McCree*, 476 U.S. 162 (1986).................................................................29

*Taylor v. Louisiana*, 419 U.S. 522 (1975) ................................................................29

*United States v. Beavers*, 756 F.3d 1044 (7th Cir. 2014) .........................................27

*United States v. Beidler*, 110 F.3d 1064 (4th Cir. 1997) ..........................................35

*United States v. Bell*, 667 F.3d 431 (4th Cir. 2011)..................................................36

*United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003)..............................................36

*United States v. Brooks*, 957 F.2d 1138 (4th Cir. 1992)............................................36

*United States v. Cole*, 2022 WL 332083 (N.D. Ohio Feb. 3, 2022).........................25

*United States v. Early*, 363 F.3d 292 (4th Cir. 2004) ...............................................32

*United States v. Elder*, —F. Supp.3d—, 2022 WL 836923 (E.D.N.Y.
    Mar. 21, 2022) ..................................................................................... 25, 35

*United States v. Elias*, 579 F. Supp.3d 374 (E.D. N.Y. 2022)...............................25

*United States v. Foster*, 507 F.3d 233 (4th Cir. 2007)..............................................35

*United States v. Foxworth*, 599 F.2d 1 (1st Cir. 1979)..............................................27

*United States v. Gonzalez-Velez*, 466 F.3d 27 (1st Cir. 2006) .................................32

*United States v. Hicks*, 948 F.2d 877 (4th Cir. 1991)................................................36

*United States v. Jones*, 533 F. App'x 291 (4th Cir. 2013).........................................28

*United States v. Kennedy*, 548 F.2d 608 (5th Cir. 1977)...........................................27

*United States v. Kiulin*, 360 F.3d 456 (4th Cir. 2004)...............................................36

*United States v. LaChance*, 788 F.2d 856 (2d Cir. 1986)..........................27

*United States v. Lavabit, LLC (In re Under Seal)*, 749 F.3d 287 (4th Cir. 2014).........................................................................................26

*United States v. Lester*, 985 F.3d 377 (4th Cir. 2021)..........................26

*United States v. Lynch*, 792 F.2d 269 (1st Cir. 1986)..........................32

*United States v. Mathis*, 932 F.3d 242 (4th Cir. 2019)..........................35

*United States v. McGee*, 736 F.3d 263 (4th Cir. 2013) ..........................36

*United States v. McMillon*, 20-cr-242-JSW, Docket No. 222 (N.D. Cal. Mar. 23, 2022)......................................................................25

*United States v. Miller*, 41 F.4th 302 (4th Cir. 2022)..........................28

*United States v. Morsley*, 64 F.3d 907 (4th Cir. 1995)..........................37

*United States v. Moses*, 566 F. Supp. 3d 217 (W.D.N.Y. 2021) ..................... 25, 30

*United States v. Nelson*, 2022 WL 1093661 (N.D. Calif. Apr. 12, 2022).....................................................................................25

*United States v. Nelson*, 718 F.2d 315, 319 (9th Cir. 1983)..................28

*United States v. O'Lear*, 2022 WL 419947 (N.D. Ohio Feb. 11, 2022).................25

*United States v. Paradies*, 98 F.3d 1266 (11th Cir. 1996)......................27

*United States v. Prince*, 647 F.3d 1257 (10th Cir. 2011) ......................32

*United States v. Pritchett*, 2022 WL 606091 (D.Del. Jan. 28, 2022) ....................33

*United States v. Rancher*, 1991 WL 141037 (4th Cir. Aug. 1, 1991) (unpublished) ............................................................................27

*United States v. Roberts*, 881 F.2d 95 (4th Cir. 1989)..........................36

*United States v. Salamone*, 800 F.2d 1216 (3d Cir. 1986) ......................32

*United States v. Webster*, 639 F.2d 174 (4th Cir. 1981)..........................27

*United States v. Wellington*, 754 F.2d 1457 (9th Cir. 1985) ..................27

*United States v. Wilson¸* 115 F.3d 1185 (4th Cir. 1997)..........................35

*United States v. Young*, 822 F.2d 1234 (2d Cir. 1987)..........................28

*United States v. Zayyad*, 741 F.3d 452 (4th Cir. 2014) ..........................26

**Statutes**

28 U.S.C. § 1861 ............................................................................ i, 1, 24

28 U.S.C. § 1867(d) ............................................................................ 26

## Issues Presented

1.      Did defendants waive their right to challenge the composition of the jury panel under the Jury Service and Selection Act, 28 U.S.C. § 1861 *et seq.*?

2.      Did defendants establish a prima facie case that the district court violated defendants' Sixth Amendment right to a venire that is a fair cross-section of the community when the court excluded a single juror solely because of the juror's vaccination status?

3.      Did sufficient evidence support the drug weight of five kilograms of cocaine or more the jury found in connection with defendant Lopez-Alvarado's conviction for conspiracy to distribute and possess with intent to distribute in Count One?

## Statement of the Case

### A.      Investigation into the Rivera Drug Trafficking Organization

In January 2019, agents investigating drug trafficking in the Hampton Roads area learned that local business owner Jaime Rivera was using his business to import cocaine from San Juan, Puerto Rico. JA68. One of Rivera's employees, Lee Curtis Spears, had prior felony drug convictions, and Rivera and others targeted him involvement in the drug trafficking organization (DTO) based upon that

1

history. JA68–69, JA361–63, JA366–76. At the same time, Rivera introduced Spears to Cruz Colon, who Spears eventually understood to be Rivera's supplier; the conspirators picked out burner phones for Spears to buy for drug-related talk. JA377–81. Spears would take up to one kilogram of cocaine at a time for distribution, at a cost of approximately $33,000 per kilogram; he could dispose of that amount through a network of lower-level street dealers he called "buffers" – in as little as one day. JA381–83. As agents made larger-scale controlled purchases, observed related proceeds collection, and eventually received a court-ordered wiretap of Spears's phone, Rivera became unable to run the DTO due to his own addiction issues, and Cruz Colon and Lopez took over managing Spears directly. JA68–69, JA384–88, JA509–10.

In very short order, Spears was routinely picking up cocaine from and giving proceeds from its sale and from the heroin to defendants at the home they shared with their children. JA69–70, JA393–94, JA399, JA405–16, JA971. In fact, at the height of their activity, the machine was so well-oiled that the distribution process was readily broken down into repeatable cycles. See JA748–754 (summarizing such a cycle for August 21–26, 2019, as set forth in Govt. Exs. 100–03; 200–03, 300, 400–08, 509–12, and related testimony). First, Cruz Colon and/or Lopez-Alvarado gave Spears drugs (heroin, cocaine, or both), which Spears then distributed to his own distributors. JA397–403. Cruz Colon then began pressing

2

Spears to collect the drug proceeds from those buffers so that Cruz Colon and

Lopez-Alvarado could collect that money and send it back to Puerto Rico for

additional drugs, in packages with altered names and addresses to attempt to evade

detection. JA402–10, JA462–63, JA501; Gov. Exs. 300, 200–03, 400–08; 509–12.

During the investigation, agents actually observed Lopez-Alvarado mail the

package with falsified name and fictitious return address on August 20, 2019.

JA501, JA526–29; Gov. Exs. 406–08.

The cycle then started all over again on September 3, 2019, with Cruz Colon

asking Spears about how he was doing with the heroin ("the other . . . whiteboy")

and saying he has "another two [kilograms of cocaine]" coming the following day.

JA 414–20; Gov. Ex. 204. And in fact, the following day, agents then observed a

7.4 pound package being dropped off at the Yucca Street address of co-conspirator

Cartagena that they later confirm contained drugs. JA505–06, JA616–19; Gov.

Exs. 409, 505–06. Just three days later, on September 7, 2019, Spears dropped off

another $33,000, and three to four days after that (September 10 and 11th) two

more apparent money packages were sent from the defendants' post office to

Puerto Rico. JA417–20, Gov. Exs. 302, 513–16.

While Lopez-Alvarado and Cruz-Colon did not marry each other until after

they were indicted for these crimes, they had been involved for at least fourteen

years and were living together and holding themselves out as married for the

3

duration of the conspiracy. JA394, JA971. And though Spears did not approve of Lopez-Alvarado being involved, she was involved to such an extent that he could not avoid dealing with her. JA395–96.

When Spears brought the $66,000 in cash to defendants' home, both Cruz Colon and Lopez-Alvarado helped count the money as he sorted it into piles of $5,000. JA394–95. Similarly, when Cruz Colon demanded that Spears gather up as much money as he could, Lopez-Alvarado was at the house to take that money (substantially more than $22,000) from Spears. JA407–13. In fact, Lopez-Alvarado was so enmeshed with the money side of the operation that not only did Spears and Cruz Colon talk about pricing around her, but when they got into a dispute over how much debt Spears owed on the heroin account as compared to the cocaine account, Lopez-Alvarado not only supplied the correct pricing figures to Cruz Colon but actually corrected him, displaying familiarity with the transactions leading to Spears's various balances. JA417–22.

Lopez-Alvarado was not just involved with collecting and tracking Spears's receipts; she was also directly involved with distributing the drugs. Of the approximately ten kilograms of cocaine Spears said he received from the defendants, he clarified that he was sure he had received at least two kilograms directly from Lopez-Alvarado's hands. Likewise, when Lopez-Alvarado answered Spears's call on Cruz Colon's phone on October 17, 2019, she did not even bother

4

to identify herself, ask who Spears was, or clarify the purpose of the call before immediately stating "we've got something for you," referring to drugs she and Cruz-Colon have for Spears to pick up. JA427; Gov. Ex. 209.

Surrounding circumstances leave little doubt that she was, in fact, referring to cocaine (other than that was the sole point of connection between the defendants and Spears). JA657. Earlier that day, Cruz Colon had a call with an unidentified Hispanic male about getting a kilogram of cocaine, referring to it as $30,000 per kilogram of a "fire" product and significantly using the same "ticket" coded language that he had used with Spears (despite speaking in a different language); Cruz Colon even said that he had to wait for the missus (referring to Lopez-Alvarado). JA424–32, Gov. Exs. 207–10. Then, immediately before the call from Spears, Cruz Colon, with Lopez-Alvarado now in the background, talks with the same unidentified male, arranging to meet up. JA638–40, Gov. Ex. 208. Less than twenty minutes later, Lopez-Alvarado told Spears that "*we've* got something for you," and less than fifteen minutes after that, Cruz Colon called Spears back and pressured him to "get right to 'this friend' that I got with me" because he "do[es]n't have the room for him now." JA426–28, Gov. Exs. 209–10.

Lopez-Alvarado was not just involved with managing the Spears end of the conspiracy, though; she was also integral to the mail side of the money laundering scheme. On August 20, 2019 – the day after Spears dropped off so much money it

5

made him nervous to wait around outside their apartment – it was Lopez-Alvarado, not Cruz Colon, whom agents followed to the Post Office. And it was *she*, not Cruz Colon, who chatted with the postal clerk about difficulties in mailing things to Puerto Rican addresses, all while she was mailing a package: (1) with a return addressee name ("Maria Rodriguez") that is not her own; (2) with a return address ("1431 Picadilly St.") that does not exist; (3) in the same handwriting as a package sent the very next day under a completely different return addressee name ("Carmen Arroyo") that is not her own but still with the same Oakmont return address; and (4) to the same individual ("Gerardo Rodriguez") to whom a package is mailed just six days later to a totally different address and in a package that now bears variations in the handwriting and return address (still Oakmont Drive, but a different building). JA480–81, JA490–91, JA501, JA526–29. Gov. Exs. 406–08, 503–04, 509–12.

The same level of caution with addresses was not exercised in the same manner by Cruz Colon with respect to the incoming drug packages. On average, of the DTO-related packages agents were able to identify, those heading from Puerto Rico to Virginia were substantially heavier, between seven and nine pounds, than those heading from Virginia to Puerto Rico, weighing between two and four pounds. JA756–59 (*comparing* Gov Exs. 500–02, 505–08 *with* Gov. Exs. 503–04, 509–16). While common sense reveals that cocaine weighs more than its U.S.

6

currency equivalent – compare one kilogram of cocaine with the weight of 330 $100 bills – but the agents' belief to that effect was confirmed when *two* of the suspected drug packages were revealed to contain two or one kilograms of cocaine.

With respect to the first package, on October 1, 2019, Cruz Colon texted an unidentified male with a variant of his own name "Luis Cruz" (defendant's middle and last names) and address (with a different apartment number); the unidentified male responded with a USPS tracking number for what turned out to be a 7.4-pound package addressed to that name and address. JA640–44, Gov. Exs. 301, 601. Agent Sylvester was able to isolate the package, and, when a narcotics-detecting K-9 alerted on it, search the package pursuant to a federal search warrant, discovering two kilograms of cocaine inside. JA553–68, Gov. Exs. 507, 601–18. Investigation revealed that the parcel was packaged in numerous layers of plastic wrap and with items designed to throw off drug-sniffing K-9s. JA555–66, Gov. Exs. 507, 601–12; 508, 701–09.

Further, this method of packaging was revealed to be something the defendants used not only with their drugs, but also with their money. A TSA agent alerted a Richmond International Airport police officer, Paul Hope, about bulk currency recovered from luggage belonging to the defendants as they passed through in December 2019. JA532–34. When Officer Hope arrived, he observed more than $20,000 of rubber-banded $100 bills – together with a dryer sheet –

7

vacuum-sealed in a thick plastic bag. JA532–35, Gov. Ex. 803.

After agents discovered that the defendants were using the U.S. mail to and from Puerto Rico as their resupply channel, receiving (heavier) packages of drugs from and sending (lighter) packages of money back to Puerto Rico, they were able to identify several parcels of interest related to the DTO and conduct three interdiction operations during which they seized a total of five kilograms of cocaine. JA70–71, JA571.

Agents were able to use all this information to identify yet another arm of the conspiracy: Cruz-Colon giving Elvin Martin Cartagena-Urbina and others amounts of cocaine to distribute in a primarily Spanish-speaking community in the Hampton Roads area. Postal investigation revealed several other packages, including those with thinly-veiled addressees, of cocaine or suspected cocaine mailed to Cruz Colon at the Yucca Street address associated with him via Martin Cartagena. JA615–24; Gov. Exs. 500, 501–02, 505–06 (5/20/19: 8.0 lb pkg; 8/10/19: 7.31 lb pkg delivered to "Jose Colon"; 9/4/19: 7.4 lb pkg delivered to "Luis Cruz").

Martin's agreeing to receive those packages at his home – in addition to selling drugs for Cruz Colon and collecting the proceeds – proved to be his undoing, as it was at that home that the one-kilogram interdiction operation concluded in February 2020, culminating in Cartagena's own arrest. JA616–18.

8

Cartagena called Cruz Colon "Bori," a nickname referring to Cruz Colon's Puerto Rican heritage as contrasted with Cartagena's own Honduran heritage, JA618–19. Just before Cartagena's February 18, 2020 arrest, Cruz Colon called him and said to expect a package, which Bori, Cartagena, and Cartagena's wife (Juliet Gamez) knew to contain drugs. JA619–20. Since agents arrested Cartagena in connection with the cocaine seizure, Cruz Colon turned his fury about the seizure of the drugs on Juliet, accusing her and the absent Martin of lying about agents seizing the drugs and stealing them for their own use specifically because "the dogs wouldn't have even been able to smell what was in the package." JA620–22.

The first time he came to her home looking for the drugs, he brought his teenaged son; he then came back a second time with an adult male friend of his. JA621. At that point, his behavior escalated from vaguely threatening to explicitly so, saying that if the money – i.e. the approximately $33,000 to make up for the seized kilogram of cocaine –was not turned over, something would happen to her baby daughter. JA621–22. When those threats were unavailing, he switched (while out on bond) to intimidating her, asking whether she was really going to testify against him; Gamez was so concerned, she saved a screenshot of his call and reported it. JA622–23, Gov. Ex. 800.

## B.    The impact of Covid-19 on jury selection and trials

Just over a month after the February 18, 2020, arrest of Cartagena and search

of his residence, the Covid-19 pandemic began shutting down schools, businesses, and even the courts. Nevertheless, Rivera, Spears, and a third co-conspirator were all indicted on charges related to the drug conspiracy in June 2020, and defendants were charged by criminal information in connection with the same in September and were subsequently indicted on drug conspiracy and distribution charges in October 2020.

On March 19, 2021, defendants charged in a superseding indictment with conspiring to distribute and possess with the intent to distribute more than five kilograms of a mixture or substance containing a detectable amount of cocaine and more than 1000 grams of a mixture or substance containing a detectable amount of heroin (Count One) and conspiring to launder money with respect to the same (Count Two). JA25–29. Spears, Rivera, and Cartagena-Urbina all pleaded guilty, while defendants were tried by a jury in September 2021. JA1–20; 4:20-cr-39.

Before trial, but after the district court had sent out juror questionnaires asking prospective jurors about their vaccination status, the district court ordered the parties to file a position regarding vaccination, including whether they were vaccinated and whether they agreed to strike unvaccinated individuals from the jury. JA57. Defendants objected to such strikes, while the Government took no position. JA58–61.

On September 10, 2021, the parties filed their Joint Motion to Excuse Jurors

for Cause. JA78. In that motion, the parties agreed that thirteen prospective jurors

(2, 10, 13, 30, 40, 43, 48, 49, 51, 55, 71, 75, and 105) should be excused for cause,

with the government requesting two additional prospective jurors (33, 34) be

excused and defendants requesting and additional sixteen prospective jurors be

excused for cause (6, 7, 12, 14, 18, 22, 23, 29, 38, 41, 45, 57, 60, 61, 70, 72, 79,

81, 84, 85, 87, 99, 101, 102, 106, and 110). JA78.

During the final pretrial conference on September 15, 2021, the district court

first went through its own list of strikes, which often overlapped with one or both

of the parties' strikes, before dealing with any leftover individual requests. JA84–

92. In its list, the court added another dozen people (19, 21, 27, 46, 52, 58, 59, 62,

65, 76, 82, 108), three of whom (59, 82, 76) were not vaccinated but presented

alternate bases upon which, the court concluded, the prospective jurors should be

excused for cause. JA84–92. Defendants' own proposal struck two prospective

jurors who were not vaccinated (29, 110), and the joint strikes included yet another

(55), leaving (10) as the final unvaccinated prospective juror. JA86,92,89.

Therefore, of the forty-four prospective jurors one or both of the parties or

the court moved to excuse for cause, only seven (15.9%) were unvaccinated and

only one (2.3%) was excused on that basis alone. Moreover, defendants *themselves*

requested to excuse almost half (three) of the unvaccinated prospective jurors.

Even more significantly, the district court excused a much larger number of

11

prospective jurors—eighteen vs. seven, or 2.5 times as many—who either expressed serious concern about contracting Covid (40, 45, 52, 62, 65, 71, 72, 87, 108) or discussed a health impairment that made them more susceptible to suffering a serious illness if they did contract Covid (2, 7, 13, 27, 29, 30, 46, 52, 58). JA84–92.

The district court then allowed counsel to make their arguments at length on the "fair cross section" argument, but then, as now, counsel were unable to articulate precisely which "distinctive" group was alleged to be excluded. JA93. Not only did the district court note that it had not received any caselaw saying that excluding unvaccinated individuals was impermissible, but it also thoughtfully went through the number of real-world factors informing its decision: (1) problems other judges had faced in conducting trials where jurors tested positive for Covid-19; (2) the issues with increased transmissibility of the Delta variant (and the effect of vaccination on that transmissibility) at the time of the trial; (3) the issues with relying upon masking alone given how long the trial days were; and (4) the fact that the jurors were compelled to be there, and, as is evidence from so many of the questionnaire responses, extremely concerned about getting Covid-19 by having to remain confined with so many strangers for such a length of time. JA93–97.

## C.    Evidence presented at trial

The trial proceeded at a swift pace, with the jury hearing from nine

witnesses and receiving at least eighty-seven pieces of evidence (including two stipulations) over the course of the two days that followed. JA312–14, JA606; Gov. Ex. List.

Spears testified at length as to his activities with Rivera, Cruz Colon, Lopez-Alvarado, and others, and explained the coded language and drug trafficking actions discussed in several of the intercepted calls and text messages, including how they related to surveillance footage captured of him delivering proceeds to the defendants' residence. JA360–469 (Gov Exs.[1] 200–204, 209–14, 300, 302, 303, 400–05). He started by describing his background, criminal history, how he came to work for Rivera, being brought into the DTO, and meeting Cruz Colon. JA361–63, JA366–76, JA384–88, JA509–10. He then spoke in depth about his own drug trafficking and his interactions with Cruz Colon and Lopez-Alvarado.

Far from "equivocating," he responded to rapid-fire questioning from the judge and counsel in a manner reasonable for someone testifying to illicit activities that largely occurred two to three years earlier. That is, rather that citing precise dates, he tended to refer to events using chronological and narrative order and was consistent about the overall order of events and key features. For instance, he

---

[1] For the ease of juror reference and clarity, the Government exhibits at trial were numbered in series (100s=wire audio; 200s=matching transcript, 300s=intercepted texts, etc.) and distributed to jurors in a binder. JA312–14, JA606. Gov. Ex. List (4:20-cr-69, ECF 82).

13

consistently testified that Rivera approached him about selling drugs (in late 2018), that he had put some cocaine Rivera had gotten from Cruz Colon "out on the street," that he had turned the money over to Rivera, and that he met Cruz Colon for the first time face-to-face sometime in 2019 in connection with a dispute over counterfeit bills being included in that money garnered from those drug transactions, i.e. "money that [he] collected from putting stuff on the street." JA372, JA376–80.

He also talked about substantive steps each had taken in furtherance of the conspiracy, such as with respect to the drug phones. Immediately after discussing how Cruz Colon had chastised him for not being careful enough with the money he was collecting from the cocaine sales, he described going to Family Dollar with Rivera and Cruz Colon to pick out phones to be used "to keep the traffic off our personal phones." JA379. When asked about the rules related to talking over those phones, he said that it "was just from experience, you knew not to talk on the phones."[2] JA380. Further underscoring their strictly limited purpose, Spears

---

[2] In the context of work adjustments Rivera made so that Spears could deal drugs, Spears spoke about recycling phones and numbers and about whether he knew the government was listening to his drug dealing. JA459–60. When counsel for Lopez-Alvarado him whether he had "those discussions" with her, Spears was clearly referring to the "discussions that it's a possibility [wiretapping] could be happening" among the parties he enumerated (himself, Rivera, and Cruz Colon), not a wholesale declaration she was not involved in any drug talk over the phone (which is counter to his testimony and exhibits). JA427, JA460. Gov. Ex. 209.

immediately put, not their personal numbers, but the burner phones' numbers into the contacts of the other burner phones and then clarified that his transactions continued to be with Rivera, as Cruz would tell Rivera how much cocaine (between a half to one kilogram) was coming, which Rivera would pass to Spears, who would let his street contacts know. JA3801–81.

He testified consistently that, for the time he was dealing with defendants, he received approximately ten kilograms from them, two to three kilograms from Rivera, and a kilogram of heroin total (half from Cruz Colon and half from Rivera). JA434–35. When the district court then circled back to Cruz-Colon (seemingly in contrast to the amounts attributable to Rivera), he reiterated ten kilograms, but when asked specifically about what he got personally from Lopez-Alvarado, he first seemed about to estimate, then thought better of it and confined himself just to that amount he knew "for sure": two kilograms. He never said he delivered money to her only once, rather describing in detail two specific incidents when he brought $66,000 in cash to defendants' home (when both Cruz Colon and Lopez-Alvarado helped count the money as he sorted it into piles of $5,000) and another when he brought more than $2]2,000 but did not stay to count it. JA394–95, JA407–13.

Counsel for the United States phrased his next question in terms of the nature and number of encounters Spears had with Lopez-Alvarado rather than drug

15

weights exchanged; far from equivocating, he answered responsively "[a]bout four to five times." JA436. While government counsel attempted to reduce that figure to specific weights, Spears remained consistent in referring to the times he met her. The only speculative part of that testimony – his following "[s]he just gave him the price and told him that's what he owe" with "I guess she kept the books" – was stricken and thus cannot be deemed to have had an improper impact. JA421. But Spears was arguably merely articulating his understanding from their way of dealing with each other (also the most reasonable inference from the events he described[3]).

After Spears testified, a series of agents involved in the investigation testified about their differing roles. First, Special Agent Bishop discussed the Title III interception process and stationary camera surveillance, as well as specific investigative details with respect to identifying the defendants' Oakmont home. JA469–88 generally, JA478. Next, Officers Zelada and Ruiz testified about surveillance that corroborated and explained the wire interceptions, including

---

[3] To wit: that the woman who received and counted large sums of money from Spears's distribution of her partner's cocaine; who gave that partner pricing information during his dispute with Spears; who understood that Spears's receipts were to be charged against both heroin and cocaine debts; who was "familiar with the transactions" underlying the "owing discrepancy"; and who resolved that discrepancy by providing a precise dollar amount ($3000) – was the bookkeeper the drug distribution family business she ran with her soon-to-be-husband and children's father out of the home wherein they lived. JA418–22.

following Spears in conjunction with the wire interceptions as he traveled to meet with his street-level distributors and about Cruz Colon's apparent retrieval of the drugs sent in the October 4th seizure (and Gamez's presence and basis of knowledge). JA489–515; JA516–24. Officer Natiello testified about surveilling the Oakmont address and the video he took of Lopez-Alvarado mailing the August 20th package. JA525–31; Gov. Ex. 406. Officer Hope testified about the airport seizure of the vacuum-sealed bulk currency (and dryer sheet) from Cruz Colon and Lopez-Alvarado en route to Puerto Rico. JA532–39, Gov. Exs. 801, 803.

U.S. Postal Inspector Sylvester testified at some length about the USPS side of the case, from postal recordkeeping and the drug interdiction process generally to his particular involvement in this case, both with respect to pulling records and searching the intercepted parcels. JA540–81. He provided substantial insight on how the packaging in this case would be used in an attempt to escape the detection of law enforcement, not just by virtue of the layers, vacuum sealing, and scent elements, but also with respect to the (mis)direction of the addresses. JA556–61.

The district court ended the jury's day a few minutes early at the conclusion of Inspector Sylvester's testimony to handle administrative matters with counsel. JA582. Anticipating the morning's schedule, the district court advised defendants of their right to testify or to remain silent and discussed stipulations. JA585–87. In the course of discussing jury instructions, the district court opined that it did not

believe the United States had met its burden with respect to the heroin being

foreseeable to Lopez-Alvarado, and expressed its intention to grant the defendants'

presumed-forthcoming motion for judgment of acquittal pursuant to Federal Rule

of Criminal Procedure 29(a) on that ground. JA587. The court appeared to be

moving towards a similar decision with respect to Lopez-Alvarado and any amount

of cocaine more than two kilograms but withheld so ruling after hearing some

preliminary argument from the United States with respect to the imputed value of

the currency of which she had personal knowledge, particularly in light of her call

with Spears and the court's (preliminary) ruling as to the heroin. JA588–94.

The next day, one of the jurors was excused and an alternate seated in her

place after it came to light that she had recognized a witness. JA602–11. The

United States concluded its case-in-chief by calling Officer Lionel Jackson, the

primary case agent and drug expert, and Juliet Gamez, Martin Cartagena's wife.

Gamez testified as to the packages received at her home on Yucca Street, Martin's

drug dealings with Cruz Colon, Cruz Colon's threats after the February raid, and

his comments about her potential testimony. JA615–30, Gov. Ex. 800.

Finally, the case agent, Officer Jackson, testified. After detailing his lengthy

narcotics investigation experience and involvement on this case, Jackson walked

the jury through two of the October 17, 2019 calls with the unidentified male.

JA635–40, Gov. Exs. 207–08. He explained several of the coded drug terms,

18

including that "ticket" was commonly used slang to refer to the amount of money needed to finalize a drug transaction; that the $15,000 here was referring to the cost of half a kilogram of cocaine; and so forth. Likewise, Jackson explained refraining from certain actions and seizures that would expose the investigation in service of the overall goal of pursuing the Puerto Rican connection. JA643–46; JA656–57. Finally, he explained how the defendants' methods of using the mail were difficult to discover in real time – or within sufficient time to take proactive investigative action – and the impact of Covid-19 on the investigation. *Id.*

The United States rested after Officer Jackson's testimony, at which time counsel for the defendants renewed their Rule 29 motions. JA658–63. The district court denied the motions as to both. As to Cruz-Colon, the court deemed the evidence "overwhelming." JA659. As to Lopez-Alvarado, the court rejected counsel's argument there had been no showing of a transaction promoting or concealing the specified unlawful activity of drug trafficking, noting that the evidence of her mailing the box could be reasonably inferred to be her mailing money from the drug trade, and that the government was entitled to all reasonable inferences at that stage. JA659–60. The court granted Lopez-Alvarado's motion as to Count One as to the heroin in accordance with its statements the preceding day. JA661. Finally, the court deemed to issue of the amount of cocaine reasonably foreseeable to Lopez-Alvarado to be "a close call," but sufficient to reach a jury,

with an invitation to brief it after the jury's verdict if needed. JA663–64.

Defendants were instructed again about their right to testify or remain silent, and

they both elected the latter. JA665–69. After some final discussion about defense

stipulated exhibits and the jury instructions, to which there were no objections, the

parties proceeded to closing. JA670–740.

In closing, while counsel for the United States did highlight why Spears was

credible – and why you need a drug dealer to get an inside look at a drug

trafficking ring – the primary focus was on how the dozens of independently

observable facts and pieces of postal and surveillance evidence confirmed Spears's

testimony and showed the overall picture of Cruz Colon and Lopez-Alvarado's

drug trafficking activities so neatly that the cycle could be plotted on a calendar.

*See* JA748–754 (summarizing such a cycle for August 21–26, 2019, as set forth in

Gov. Exs. 200–03, 300, 400–08, 509–12, and related testimony). First, the

government emphasized how the clear drug dealing and money laundering conduct

in the intercepted calls and wires explicitly proved Cruz Colon's guilt before

directly leading back to Lopez-Alvarado, sometimes literally, as in the case of the

August 19th money drop. JA748–52.

The government further emphasized the role reasonable inferences played

in, for instance, understanding intuitively what spouses may be reasonably

understood to foresee and why it is ludicrous to argue that someone who is not a

20

drug dealer would not only travel with bulk currency but vacuum seal it with a dryer sheet. JA763, JA795–800, JA803–04. Likewise, the government addressed how criminals use false mailing information to provide distance from liability but why it would also be unlikely for someone randomly to address several packages with close-but-fictitious names and addresses that just happen to be closely associated with (or in fact in the possession of) Lopez-Alvarado. JA753–58. And the government addressed how it is difficult to argue her statement – on the drug phone to a man whose only connection is that of co-conspirator – "we've got something for you" can mean anything other than cocaine when her husband's statements moments earlier and later make clear that meaning. JA760–62.

Counsel for defendants made several of the same arguments raised in the brief with respect to the sufficiency of the evidence, both to the jury and later to the district court in their renewed motion for judgment of acquittal and for a new trial. JA832–51. For Cruz Colon, counsel argued that Spears and Gamez are not credible; the government's case rested exclusively on innuendo and failed because the agents did not open one of the money shipments; and that storing the airport bulk currency in that manner was "a good idea." JA767–73. For Lopez-Alvarado, counsel repeated the attack on Spears's credibility, together with emphasizing partial truths (e.g. "zero evidence" she lived at 143[1] Picadilly, while not addressing the fact that it was a fictitious address); denying the significance of

21

actual observations (e.g. her interaction with Spears on August 19, 2019); and deflecting the blame to Cruz-Colon. JA780, JA784–88. Her counsel also spent a significant amount of time addressing the drug weight in the alternative. JA789–93.

Having heard those arguments, and despite having to sift through evidence so voluminous that they were each issued their own individual binders with which to follow along, it took the jury less than ninety minutes to decide unanimously that Cruz Colon and Lopez-Alvarado were both guilty on all remaining counts at the maximum possible weight. JA815, JA828–31.

Counsel for defendants made largely the same arguments in their motions for judgments of acquittal and for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. JA832–51. Of note for purposes of the instant appeal, Lopez-Alvarado conceded in her motion that the evidence was sufficient to find that she participated in a conspiracy both to distribute and to possess with the intent to distribute 500 grams or more of cocaine but that the evidence was insufficient as to the five kilograms or more amount with respect to her. JA833. The district court denied those motions without a hearing, finding that "with respect to each count, the Government introduced evidence that supported the jury's verdict and overwhelming[ly] established Defendants' guilt, as well as the weight of the drugs attributed to each Defendant." JA852.

22

In her Presentence Report, the U.S. Probation Office found more than 13.6 kilograms of cocaine attributable to Lopez-Alvarado. JA968 (excluding the objected-to-and-sustained amount attributable to heroin for her). On March 21, 2022, the district court sentenced Lopez-Alvarado to the mandatory minimum sentence of 120 months on both counts, to be served concurrently and to be followed by a total of five years of supervised release, and Cruz Colon to a total of 312 months to be followed by a total of five years of supervised release. JA937–50. In so doing, the district court reiterated, as to Lopez-Alvarado, that the evidence was overwhelming as to not only the fact of her guilt, but the drug weight, noting "the jury, in my view, quite properly held her accountable for her role in the conspiracy to distribute cocaine . . . in an amount that to me there was no question would be attributed to her." JA900.

This appeal followed. JA951–54.

## Summary of Argument

Defendants have limited their challenge on appeal to the district court's exclusion of an unvaccinated juror to a claim that the district court violated their Sixth Amendment right to a fair cross-section of the community. But that argument fails because defendants cannot show that unvaccinated jurors are a distinctive group for purposes of the Sixth Amendment. There are many different reasons that people have chosen to remain unvaccinated, and even which people remain

23

unvaccinated changes over time. Courts have overwhelmingly rejected that unvaccinated prospective jurors qualify as a distinctive group, and vaccination status is similar to other categories that courts have found insufficient to trigger the fair cross-section right.

The evidence in this case was also overwhelming, and defendant Lopez-Alvarado cannot overturn a jury verdict by challenging witness credibility or inferences that a jury may reasonably draw from the evidence.

Accordingly, this Court should affirm the judgment.

## Argument

**I.  Defendants never argued in the district court or on appeal that the Jury Service and Selection Act, 28 U.S.C. § 1861 *et seq.*, was violated and have waived any such claim, relying instead solely on a constitutional fair cross-section challenge to the trial jury.**

The Jury Service and Selection Act, 28 U.S.C. § 1861 *et seq.*, provides a framework for challenging the exclusion of prospective jurors. In analyzing the exclusion of unvaccinated prospective jurors under the Act, a number of district courts have relied on the provision in § 1866(c)(2) that "any person summoned for jury service may be … excluded by the court on the ground that such person['s] … service as a juror would be likely to disrupt the proceedings." These courts have relied on the then-existing conditions in evaluating whether an unvaccinated juror would be likely "to contract and spread COVID-19, which would delay or suspend

24

the proceedings while jurors isolate." *United States v. Nelson*, 2022 WL 1093661,

at *2 (N.D. Calif. Apr. 12, 2022) (citing *United States v. Cole*, 2022 WL 332083,

at *5 (N.D. Ohio Feb. 3, 2022); *United States v. Elias*, 579 F. Supp.3d 374, 383

(E.D. N.Y. 2022); *Joffe v. King & Spalding LLP*, 575 F. Supp. 3d 427, 432

(S.D.N.Y. 2021); *United States v. Moses*, 566 F. Supp. 3d 217, 223 (W.D.N.Y.

2021); *United States v. O'Lear*, 2022 WL 419947, at *3 (N.D. Ohio Feb. 11,

2022); *United States v. McMillon*, 20-cr-242-JSW, Docket No. 222, at 6 (N.D. Cal.

Mar. 23, 2022)).

Courts have summarized a wide range of problems that can arise if an

unvaccinated juror became infected with Covid-19:

> Introducing unvaccinated jurors would have created a substantial risk that at
> least one trial participant would contract COVID-19. A COVID-19 infection
> among jurors during trial could have caused, among other things, delays,
> postponements, scheduling conflicts, and logistical complications. Jurors
> would have been required to quarantine. Some jurors may have been
> dismissed, while others may have been hospitalized or worse. Had the virus
> spread throughout members of the jury, the trial may have concluded in a
> mistrial for failure to seat the appropriate number of jurors. Even without
> dismissals vaccinated jurors may have experienced reasonable fears related
> to serving alongside unvaccinated individuals. These anxieties may have
> interfered with and distracted from jurors' performance of their civic duty.

*United States v. Elder*, —F. Supp.3d—, 2022 WL 836923, at *12 (E.D.N.Y. Mar.

21, 2022) (citations omitted).

In keeping with the points made in *Elder*, courts have also concluded that

excluding an unvaccinated juror was justified because the unvaccinated juror

"would be likely to … adversely affect the integrity of jury deliberations." *Elias*, 579 F. Supp.3d at 383 (citing § 1866(c)(5)).

But defendants never invoked the Jury Selection and Service Act in the district court. "Arguments raised in a trial court must be specific and in line with those raised on appeal." *United States v. Lester*, 985 F.3d 377, 386 (4th Cir. 2021) (quoting *United States v. Lavabit, LLC (In re Under Seal)*, 749 F.3d 287 (4th Cir. 2014)); *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014) (defendant must raise basis for challenge in the district court). Moreover, even apart from those general preservation requirements, defendants also did not comply with the strict procedures in the Act for raising a challenge, thereby also waiving relief.

Defendants never filed a motion under the Act as required by § 1867(a), even though they were aware as early as May 2021 that the district court was asking jurors about their vaccination status in juror questionnaires designed to determine which prospective jurors could be seated on the jury, and expressly declined to object to those questions. JA34, 36, 38, 49. Section 1867(a) requires a defendant to move "within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds" for a motion under the Act.

In addition to not moving for relief, defendants did not file the required factual certification under § 1867(d). "Under 28 U.S.C. § 1867(d) a defendant challenging the method by which juries are selected is required to file along with

26

his motion a 'sworn statement of facts which, if true, would constitute substantial failure to comply with the provisions of this title.' Failure to file such a sworn statement requires that the motion be denied." *United States v. Rancher*, 1991 WL 141037, at *2 (4th Cir. Aug. 1, 1991) (unpublished) (citing *United States v. LaChance*, 788 F.2d 856, 870 (2d Cir. 1986); *United States v. Wellington*, 754 F.2d 1457, 1468 (9th Cir. 1985); *United States v. Foxworth*, 599 F.2d 1, 3 (1st Cir. 1979); *United States v. Kennedy*, 548 F.2d 608, 613 (5th Cir. 1977)).

Section 1867(e) provides similarly that a conforming motion is "the exclusive means by which a person accused of a Federal crime … may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title."

And waiver under the Act flatly bars relief now. *United States v. Webster*, 639 F.2d 174, 180 (4th Cir. 1981); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) (statutory challenge waived where defendant failed to file motion before voir dire began and failed to provide a "sworn statement of facts"); *United States v. Paradies*, 98 F.3d 1266, 1277 (11th Cir. 1996) ("The timeliness requirement 'is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act.").

Separately, defendants have not invoked the Act in their opening brief, which again waives relief under the Act. *See, e.g., United States v. Miller*, 41 F.4th

27

302, 313 (4th Cir. 2022). In short, defendants cannot obtain relief under the Jury

Selection and Service Act.

## II. Defendants failed to make a prima facie showing of a Sixth Amendment fair-cross-section violation.

Although defendants do not have before this Court a claim under the Jury

Selection and Service Act, courts have not treated a failure to seek relief under that

Act as a flat bar on relief under the Sixth Amendment's requirement that a jury

venire represent a fair cross-section of the community. *See, e.g., United States v.*

*Young*, 822 F.2d 1234, 1239 (2d Cir. 1987) ("Although it bars them from statutory

relief, defendants' failure to comply with the provisions of the Jury Selection Act

does not preclude them from raising a constitutional challenge to the makeup of the

venire, based on the [S]ixth [A]mendment."); *United States v. Nelson*, 718 F.2d

315, 319 (9th Cir. 1983) (same). This Court has likewise treated the constitutional

claim as distinct and subject to different preservation rules. *United States v. Jones*,

533 F. App'x 291, 299–300 (4th Cir. 2013).

Nevertheless, even as to a Sixth Amendment claim, defendants offered in the

district court virtually no legal authority to support their constitutional challenge to

the exclusion of the unvaccinated juror, and they never described for the district

court the legal framework governing such claims. Because they never described

the governing legal framework, they offered no specific arguments on the required

28

showing that they had to make. Defendants can hardly complain, therefore, that the district court never discussed in detail legal standards that defendants never invoked.

The Supreme Court has explained that "to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement," a defendant "must show: '(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.'" *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

In applying these standards, the Supreme Court has noted that "[w]e have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." *Lockhart v. McCree*, 476 U.S. 162, 173 (1986) (citing *Duren*, 439 U.S. at 363–64; *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)).  As *Taylor* said, "we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." 419 U.S. at 538. The discriminatory use of peremptory challenges is governed by *Batson v. Kentucky*,

476 U.S. 79, 84–85 n.4 (1986), and defendants expressly disavowed a *Batson* claim in the district court. JA96.

As multiple district courts have correctly concluded, defendants' Sixth Amendment fair-cross-section claim fails at its inception because defendants have not identified, either below or on appeal, a "distinctive group" that the district court excluded. Much of defendants' claim centers around the idea that unvaccinated prospective jurors might have shared views with defendants and that defendants are entitled to have such people on the jury. As they put it, "The defendants were deprived of the commonsense judgment of people who, like them, were unvaccinated." Def. Br. 28. But this argument has no footing in the record and is, in any event, legally unsound.

As a factual matter, defendant failed completely to establish any such commonality in the views of unvaccinated prospective jurors—much less that those who are unvaccinated share the same reasons for not being vaccinated. *See United States v. Moses*, 566 F. Supp. 3d 217, 222 (W.D.N.Y. 2021) ("On the record before the Court there is no basis to conclude that individuals who are unvaccinated against COVID-19 satisfy the standard for distinctive. There are myriad reasons why an individual might not to be vaccinated. There will thus be 'vast variations in attitudes, viewpoints, and experiences' within the relevant group."); *United States v. Elder*, 2022 WL 836923, at *11 (E.D.N.Y. Mar. 21,

2022) ("It cannot be said that unvaccinated individuals are a 'distinctive' group because there are many reasons why a person may choose not to get vaccinated, membership in the 'group' changes daily, and vaccination status is a poor proxy for individuals holding a particular point of view."). Moreover, "[t]here is nothing to suggest that the viewpoints held by the unvaccinated will not be adequately represented by the vaccinated." *Joffe v. King & Spalding LLP*, 575 F. Supp. 3d 427, 434 (S.D.N.Y. 2021). Indeed, the record does not even disclose the defendants' own reason for choosing to forego the vaccine. The defendants simply informed the district court that they had "sincerely held beliefs which prohibit them from being vaccinated." JA58. The record, however, does not disclose the substance of that belief, which could relate to any number of factors. *See Joffe*, 575 F. Supp. 3d at 434 n.23 ("Based on anecdotal experience, press reports and litigation in this and other Courts, among the reasons people have given for not being vaccinated are: religious objections; fear of medical allergies or side effects; concern that the vaccine may affect fertility; concern that the vaccine may have unknown adverse side effects in the future; uncertainty about the location of available vaccine clinics; procrastination; fear of needles; suspicion of Big Pharma; and concern that the side effects may cause the person to miss work and not be paid.").

But as a legal matter, defendants' claim also fails. The Supreme Court has

31

long said that "groups defined solely in terms of shared attitudes that would

prevent or substantially impair members of the group from performing one of their

duties as jurors … are not 'distinctive groups' for fair-cross-section purposes."

*Lockhart*, 476 U.S. at 174. Thus, screening jurors for their willingness to apply the

death penalty does not violate the fair-cross-section requirement in the Sixth

Amendment, even when the jury convicts a defendant who is not subject to capital

punishment. *See, e.g., United States v. Early*, 363 F.3d 292, 298 (4th Cir. 2004)

(citing *Buchanan v. Kentucky*, 483 U.S. 162, 177–78 (1986)). "Ultimately, the fair-

cross-section doctrine does not suggest that an impartial jury must be composed of

individuals with diverse opinions or ideologies." *United States v. Prince*, 647 F.3d

1257, 1265 (10th Cir. 2011). As the Supreme Court stated in *Lockhart*, "any

requirement that jurors should hold a discrete mix of viewpoints is 'both illogical

and hopelessly impractical.'" *Id*. (quoting *Lockhart*, 476 U.S. at 178).

Similarly, a "distinctive group" under the fair-cross-section requirement

does not encompass public housing residents, *United States v. Gonzalez-Velez*, 466

F.3d 27, 39 (1st Cir. 2006)  persons 18 to 34 years old, *United States v. Lynch*, 792

F.2d 269, 271 (1st Cir. 1986) (citing *Barber v. Ponte*, 772 F.2d 982 (1st Cir. 1985)

(en banc)), or members of the National Rifle Association, *United States v.*

*Salamone*, 800 F.2d 1216, 1219 (3d Cir. 1986).

Moreover, as *Moses* noted, who counts as unvaccinated is hardly

32

unchanging, further undermining that it is any sort of stable, unchanging, and well defined "distinctive group": "[E]ven assuming that all members of the unvaccinated group had a shared attitude regarding vaccination—a highly speculative assumption on this record, given that the group for example likely includes individuals who would like to be vaccinated but cannot be for medical reasons—membership in the unvaccinated group changes on a daily basis, and exclusion of the unvaccinated from the jury does not pose a danger of any partiality or bias against other unvaccinated individuals." *Moses*, 566 F. Supp.3d at 222. "Whether or not to be vaccinated is not an immutable characteristic, but an active choice made by a particular person for his or her own individual reasons." *Id*.

To support his constitutional fair-cross-section claim, defendants invoke a single district court opinion that addresses an exclusion of an unvaccinated juror, *United States v. Pritchett*, 2022 WL 606091 (D.Del. Jan. 28, 2022). But *Pritchett* establishes little more than the unsurprising conclusion that a judge is not required to screen out unvaccinated jurors, and the court there concluded that it would "wait until *voir dire* to test the vaccination status of potential jurors. At that point, the Parties and the Court have a better sense of how any exclusion will impact the make-up of the jury, and it can decide then how best to balance the need for a smooth trial with the various rights at play." *Id*. at *2. *Pritchett*'s brief discussion

33

hardly establishes that the authority discussed above is in error.

Because defendants' claim on appeal about the exclusion of an unvaccinated juror is limited solely to a Sixth Amendment fair-cross-section claim, and defendants fail to show that vaccination status counts as a "distinctive group" under the Sixth Amendment, this Court need not address the second and third factors under *Duren*. It suffices to decide this appeal that defendants rely on a narrow, highly specific legal challenge about the exclusion of the sole juror who was not seated because of vaccination status, and that the narrow theory defendants advance fails at the threshold. Defendants offer no persuasive reason for deeming unvaccinated prospective jurors a distinctive group, and numerous courts have correctly rejected such a claim.

### III. Substantial evidence supported the jury's finding of guilt as to defendant Lopez-Alvarado.

Lopez-Alvarado contests only that the evidence was insufficient to convict her of conspiring to distribute five kilograms or more of cocaine, leaving unchallenged the jury's finding with respect to the conspiracy to possess with the intent to distribute five kilograms or more of cocaine, as well as the conspiracy to launder money conviction. ECF No. 16, p.7; JA830–31. But as she must in light of her concession in her motion for judgment of acquittal and for a new trial, in the portion of her brief addressing sufficiency of the evidence, Lopez-Alvarado limits

34

the scope of her appeal further by attacking just the sufficiency of the evidence with respect to the amount (five kilograms or more of cocaine), not the underlying conduct. ECF No. 16, p.29.

When sufficiency of the evidence is challenged, this Court will sustain the conviction "when there is substantial evidence, construed in the light most favorable to the government, supporting the verdict." *United States v. Mathis*, 932 F.3d 242, 258 (4th Cir. 2019) (citation omitted). A defendant challenging the sufficiency of the evidence faces a heavy burden. *United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007) (citing *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997)). The Court does not review the credibility of witnesses when evaluating sufficiency challenges. *United States v. Wilson¸* 115 F.3d 1185, 1190 (4th Cir. 1997). Further, the Court must assume that the jury resolved all contradictions in the testimony in favor of the government. *United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007) (citing *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998)).

The volume of evidence discussed herein puts forth its own case, and that fact is confirmed by the swift verdict of the twelve jurors and the district court's conclusion that the outcome was inescapable. Finally, the probation officer and supervisor not only found the same as the preceding parties, but they actually quantified it, calculating in painstaking detail the true comparative measure of the

35

amount of cocaine attributable to Lopez-Alvarado: 13,638.04 grams of cocaine. JA964–67. Thus, this is not a case of a close call, but rather an easily and concretely calculable amount of two and a half times the statutory threshold.

Specifically as to the cocaine weight, the factfinder is not to look at the total weight attributable to the entire conspiracy, but rather the amount of cocaine attributable to Lopez-Alvarado as co-conspirator. *United States v. Bolden*, 325 F.3d 471, 499 (4th Cir. 2003). That amount includes those quantities she personally distributed or possessed with the intent to distribute ___or___ those that she could have reasonably foreseen that others would distribute or possess with the intent to distribute during and in furtherance of the conspiracy. *United States v. Bell*, 667 F.3d 431, 441 (4th Cir. 2011). Those amounts can include those actually or constructively possessed, amounts that were negotiated but not actually delivered, and amounts sold to undercover government agents. *United States v. Brooks*, 957 F.2d 1138, 1150–51 (4th Cir. 1992); *United States v. Roberts*, 881 F.2d 95, 104–05 (4th Cir. 1989).

Of particular import in this case, the quantity also includes the "drug equivalent of the cash seized," as long as the evidence proves the cash came from the sale of drugs. *United States v. McGee*, 736 F.3d 263, 271–72 (4th Cir. 2013), *cert. denied*, 572 U.S. 1028 (2014); *United States v. Kiulin*, 360 F.3d 456, 461–62 (4th Cir. 2004); and *United States v. Hicks*, 948 F.2d 877, 882 (4th Cir. 1991).

36

Courts, though, must be careful to avoid double-counting drugs and drug proceeds. *United States v. Morsley*, 64 F.3d 907, 915–16 (4th Cir. 1995).[4]

Of paramount importance here is that the facts of the case – Lopez-Alvarado's bookkeeper-like role, position of trust as Cruz Colon's wife, and resident at the central hub of operations – rendered virtually all the drugs that flowed through the operation foreseeable to her, notwithstanding the district court's finding as to heroin. As noted, while Lopez-Alvarado and Cruz-Colon did not marry each other until after they were indicted for these crimes, they have been involved for at least fourteen years, based upon the age of their daughter, and were living together and holding themselves out as married for the duration of the conspiracy. JA971. They were not distantly related co-conspirators involved in a sprawling organization; they were a long-term couple with children running drug operations out of their home.

Moreover, defendant was not an unwitting dupe of her husband but a sophisticated partner intimately involved in every aspect of the scheme: involved in coordinating meetings and exchanges with Spears and Cruz-Colon; personally handed drugs to Spears; received money drop offs from Spears; counted $66,000 in

---

[4] In this case, counsel for the United States and the U.S. Probation Office both explicitly noted where they were disallowing certain amounts to avoid double counting. JA914–16; JA965–66.

drug proceeds with Spears and Cruz-Colon while Spears updated them on the status of co-conspirator Rivera; and mailed and received tracking information for packages with falsified names and addresses. *See, e.g.*, JA394–96, JA413, JA434–37, JA462–63. *See also* Govt. Exs. 109–10; 209–10, 300, 400–08, 500–16, and related trial testimony (JA400–14, JA426–28, JA556–57). In fact, she was so aware of and involved in the conspiracy with Spears that, when she answered Cruz-Colon's phone in response to Spears's call on October 17, 2019, she did not even bother to identify herself, ask who Spears was, or clarify the purpose of the call before immediately stating "***we've*** got something for you," referring to drugs she and Cruz-Colon have for Spears to pick up. JA427; Govt. Ex. 109, 209 (emphasis added).

Further, the tremendous volume of inarguably drug-derived cash either converted to tremendous quantities itself or (to avoid double counting) bolstered Spears's account of the volume. Here, the value of cocaine is very well established to be between $30,000-$33,000 per kilogram. Further the presentence report actually understates the amount Spears attributed to Cruz Colon and Lopez-Alvarado, whereas he had an amount of ten kilograms and the PSR assigns only eight. JA964.The five mailings to Yucca alone would average out to 2.5 kilograms of cocaine. Gov. Exs. 500–02, 505–08, 601–18, 701–09. Likewise, in the span of just three weeks, there were five money parcels to Puerto Rico. Gov. Exhs. 503–

38

04, 509–16. Spears's testimony and the wire evidence make clear that he was gathering money as quickly as he could and that he had dropped off at least $22,000 and likely substantially more in advance of that first August 20th mailing, leading to a conservative value of those mailings of approximately $110,000 or over 3 kilograms of cocaine. Again, it can either stand alone as an indicia of volume or serve to support Spears's estimate as eminently reasonable, if not undercounting.

The PSR's granular detail as to its cautious drug weight calculations, indicates, if nothing else, that 13 kilograms is a conservative value and well in excess of the five kilograms or more found by the jury and upheld repeatedly by the district court.

## Conclusion

For the reasons stated above, this Court should affirm the judgment.

Respectfully submitted,

Jessica D. Aber
United States Attorney


_____
                                    /s/
Julie D. Podlesni
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States respectfully suggests that oral argument is not necessary in this case.  The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.


## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 9,495 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

_____/s/_____
Julie D. Podlesni
Assistant United States Attorney